COLLINS (JACQUES v.). See Cases Nos. 7,-167 and 7,168.

## Case No. 3,015a.

### COLLINS v. JOHNSON.

[Hempst. 279.][1]

Superior Court, D. Arkansas. July, 1835.

ACTION OF DEBT ON ACCOUNT—WAIVER OF TORT—EVIDENCE—WITNESS—INSTRUCTIONS.

1. An action of debt will lie on an account, as well as assumpsit.

2. A party may waive a tort, and sue in debt or assumpsit; when indebitatus assumpsit is maintainable, debt is also.

3. Testimony rejected; witness called to explain testimony, and instructions to jury,—all proper.

4. The case of Janes v. Buzzard [Case No. 7,206b] cited and approved.

Error to Clark county circuit court.

[At law. Action of debt by Balda C. Johnson against Moses Collins.]

Before JOHNSON and YELL, JJ.

YELL, Judge, delivered the opinion of the court. This was an action of debt, brought to recover the value of 4,007 pounds of seed cotton, delivered by Johnson to Collins to be ginned. A demand was made for the cotton, and a refusal by Collins, and upon that refusal Johnson, the plaintiff in the court below, commenced this suit before Isaac Ward, a justice of the peace, in an action of debt on account. There was a judgment before the justice of the peace in favor of the defendant, Collins, from which judgment Johnson prayed an appeal to the Clark circuit court; and at the October term of that court, 1833, Johnson recovered a judgment against Collins for the sum of fifty-two dollars and fifty-nine cents and costs, to which judgment this writ of error is prosecuted.

The plaintiff in error set up various grounds to reverse the judgment of the court below. (1) Because an action of debt will not lie to recover the price of cotton delivered at a gin, and a refusal to pay or redeliver, unless the cotton had been converted into cash, when the tort might be waived, and assumpsit sustained for money had and received to plaintiff's use. (2) The court refused to suffer a witness to state what the defendant Collins said or answered, when the demand for the cotton was made. (3) The court refused the witness permission to answer as to the solvency of Allen H. Johnson about the date of this transaction. (4) The court permitted a witness to be recalled and examined after he had been fully examined and discharged. (5) Exception to the in-

[1] [Reported by Samuel H. Hempstead, Esq.]

under this indictment. Nevertheless, the jury convicted Grimes and Williams of manslaughter, and Harding of murder; whereas they all should have been convicted of murder or of manslaughter, or acquitted.

["(4) Because the defendants having applied for separate trials, before jury sworn or plea pleaded, in order that they, or either of them, might not be deprived of the benefit of such witnesses as they were or might be entitled to, the learned judge overruled the said application. (5) Because the defendants, Harding, Grimes, and Williams, applied to the court at various times, and at different and proper stages of the trial (as appears by the record or minutes), for permission to take a verdict in the case of Brown, Swan, and Adams, in order that they might be examined as witnesses. The court refused to allow such verdict to be taken, although the said Brown, Swan and Adams, having been finally acquitted, the other defendants were legally entitled to their testimony. (6) Because the court having directed the jury, upon the close of the case of the prosecution, to find a verdict of not guilty in the cases of Lope and Adams, the jury declined to find such verdict in regard to Adams, but complied with the instructions of the court so far as regarded Lope, and acquitted him accordingly; whereby the defendants were illegally deprived of the testimony of Adams. (7) Because the evidence of Adams, Swan and Brown, thus excluded, would have established the innocence of Harding, Grimes, and Williams, and led to their acquittal."] [2]

The only proof of what the evidence on the trial or the charge of the court was, were the notes of counsel who tried the case, and a report of the trial in one of the newspapers of the day, professing to give, in most parts, the words of the witness or court, though, in others, their substance only, and sometimes their effect.

On the argument before the new court, the attention of counsel was directed to the following points: (1) Whether it was in the power of the court to grant a new trial after a capital conviction. (2) Whether the present court, being composed of judges whose commissions bear date since the verdict in the case, and who therefore have no judicial knowledge of its merits, can pass sentence on the prisoners. [3]

These points, with those already mentioned as having been made before the former court, were accordingly now argued:

Mr. Pettit, U. S. Dist. Atty., and Mr. J. M. Rush, for the prosecution. The finding is good. Hawkins lays it down that, "if there

[2] [From 6 Pa. Law J. 14.]

[3] By act of congress April 30, 1790 [1 Stat. 112], manslaughter, of which two of the prisoners were convicted, is punishable, in the discretion of the court, with imprisonment not exceeding three years, and fine not exceeding $1,000.

were malice in the abettor, and none in the person who struck the party, it will be murder as to the abettor, and manslaughter only as to the other." P. C. bk. 2, c. 29, § 7. This embraces our case in principle, and it has been decided in instance, as long ago as 1795, and in our own country. State v. Arden, 1 Bay, 487. The power of the court to grant a new trial in capital cases has been denied by Story, J.,[4] with earnestness; and there is an obiter dictum to the same effect by Sutherland, J. (People v. Comstock, 8 Wend. 549), of New York. It is proper to state, however, that we rest our case upon the merits; more particularly since, in another case [5] decided by Story, J., in 1835, he uses language apparently irreconcilable with the opinion set forth by him in 1834. As to the right to pass sentence, in civil cases, the power of a judge to give judgment on a verdict taken by his predecessor is clear (Life & Fire Ins. Co. v. Wilson's Heirs, 8 Pet. [33

---

[4] U. S. v. Gibert [Case No. 15,204], decided in 1834. In the case here referred to, Mr. Justice Story examines the matter very laboriously at common law and under the constitution. He cites many cases to shew that it is a fundamental maxim of the common law that there can be no second prosecution in a capital case, where there has been a verdict of acquittal or conviction regularly had upon a sufficient indictment; and makes it evident that in England the practice where a prisoner has been wrongfully found guilty is to apply to the crown for relief. The American decisions (of which he cites three where new trials have been held in capital cases) he disposes of by the remark that in most of them the constitutional prohibition was not made a point in the case, or that the trial was in a local court, where the constitution of the state contained no clause similar to that in the constitution of the United States, or that the case was ill considered, imperfectly reported, or, on some other account, not strong authority. He thinks that the mode usual in England of application to the executive is perfectly adequate to secure the ends of justice here; that the court itself, if conscious of serious errour, would aid in such application; and remarks that this ultimate appeal to the pardoning power has been deemed satisfactory and safe in the land of our ancestors. His honour, however, takes up each of very many reasons presented for a new trial, and, after examining them separately, and at length, concludes that, if the power to grant a new trial exists, the case is deficient in merits. Judge Davis, the district judge, dissented from Judge Story as to the power to grant a new trial, which he thought clear, if the prisoner desired one; but, agreeing as to the absence of merits, the motion for a new trial was of course overruled, and on that ground alone.

[5] U. S. v. Battiste [Case No. 14,545], where, in arguing on a capital case, against the right of the jury to pass upon the law, his honour says: "If the jury were at liberty to settle the law for themselves, the effect would be not only that the law itself would be most uncertain from the different views which juries might take of it, but, in case of errour, there would be no remedy or redress for the injured party; for the court would not have any right to review the law, as it had been settled by the jury. On the contrary, if the court should err in laying down the law to the jury, there is an adequate remedy for the injured party by a motion for a new trial," etc.

U. S.] 291), and it has been decided to exist equally in criminal cases: (1) In Pennsylvania (Anon.),[6] where it is said to have been decided (and, apparently, on principles independent of the state law) that where the indictment is good, and there is no error in the trial (sentence only being defective), the court will not send the prisoner back for a new trial, but will sentence him de novo. (2) In Alabama (Charles v. State, 4 Port. 107; [Flora v. State] Id. 111), where it was decided, in a capital case, that a judge who is appointed since the one who took a verdict of guilty, and who died before he pronounced sentence, has power, equally with the former judge, to proceed and give sentence in the case. As to the prisoners convicted of manslaughter, they cannot object if they receive the lowest measure of punishment. It is intimated, in the case just cited (page 110), that if there be any doubt as to whether the verdict was against evidence, the new judge may ascertain whether or not his predecessor was satisfied with it. We do not, however, suggest such an inquiry, unless the information be desired by the court, when we should be able to make known the conclusion to which the late Judge Randall had, in point of fact, arrived.

The merits of the case were, of course, fully discussed on both sides.

Mr. D. P. Brown, for the prisoners. Hawkins, though his work is in general weighed down with references, does not, on the point for which he is cited, refer to a single case. A single case counsel here have found, but that vouches no authority as good as Hawkins himself. (The counsel was about to pass over the second point, as waived by the candour of the district attorney; but, the court desiring to hear it spoken to by the defence, he proceeded to argue it.)

The construction given in U. S. v. Gibert [Case No. 15,204], or, rather, by Mr. Justice Story in that case, to the provision of "not twice in jeopardy," is shocking on principle, and on precedent is false. If, upon a good record, one which affords no evidence of a mistrial, a person whom the court believes to be innocent is found guilty through the prejudice of the jury,[7] what is to be done? or if the court has admitted testimony which reflection satisfies it was not evidence? or asserted doctrine which it discovers was not law? These are common cases. Extreme ones may be supposed. Mr. Justice Story argues that the prisoner may apply to the executive, and "it cannot be doubted," he proceeds, "that the court, if conscious of any serious errour, would cheerfully aid in the application." But the executive is not bound to pardon, and may decline. What then becomes of the prisoner? He has been found guilty. He is believed to be innocent. A new trial cannot be granted him. The executive does not pardon, and the court, "conscious," by Mr. Justice Story's hypothesis, "of serious errour," is to do what? To sentence him to death? To discharge him after a verdict of guilty? Or to leave him to die a natural death in gaol?—when, if innocent, he ought to be at large, or, if guilty, to be hanged. Besides, if the executive have power to pardon, it has none to acquit. If the prisoner is admitted to be innocent, he has a right to be found so; for every man charged with an offence has a right to a fair and legal trial.[8] Is it not moreover a mistake, as to the true nature of executive power, to treat the president as a court of errour and appeals? There are many cases—among them the case of great state criminals—in which policy may require a remission of a punishment strictly due, and for a crime certainly ascertained. The peculiarly appropriate sphere of executive action is in such cases, and the very notion of mercy implies the accuracy of theoretic justice.

The doctrine in question is at war with all American authority. The clause of the constitution relied on by Judge Story was adopted in 1789, and until 1834, when that late eminent judge gave to it a new construction, no one ever doubted that it was made in favour of life, and not for its destruction. The former construction had been given to it in many cases, as: (1) In 1794, by one of the superior courts of South Carolina (State v. Hopkins, 1 Bay, 372), Rutledge, afterwards chief justice of the United States, presiding. Judge Story would intimate, indeed, that the case was not one of a capital offence; but to any one who reads the report, nothing can be clearer than that it was so;[9] and the fact noted by Judge Story "that the power to grant a new trial was silently taken for granted on all sides," argues quite as much in favour of the power as it can detract from the value of the decision. "The constitution of South Carolina," the learned judge thinks it "material" to state, "contains no prohibition on the subject."

---

[6] Mentioned from the bench, in Drew v. Com., 1 Whart. 281.

[7] This case, the counsel said, had occurred in Ball v. Com., 8 Leigh, 726, where the court believed that the evidence was "utterly insufficient," and where the jury, disregarding all recommendation from the court, persisted in adhering to a verdict of guilty.

[8] In both the cases of State v. Hopkins, 1 Bay, 372, and U. S. v. Fries, 3 Dall. [3 U. S.] 515, the prisoner, found guilty on the first trial, was acquitted on the second. The same result took place, it is probable, in Jerry v. State, 1 Blackf. 395, and in Ball v. Com., 8 Leigh, 726; in the former of which cases, the evidence on which the verdict was given is said to have been doubtful, and in the latter "utterly insufficient."

[9] One of the counsel, in arguing for a new trial, on the ground of an unfair verdict, says: "The juryman had declared that he was 'determined to hang the prisoner at all events.' No words could possibly express a greater degree of malice and ill will against the unfortunate man whose life was about to be committed to a jury of his country." Page 373.

But how is this material, if, as his honour has taken so much pains to shew,—and as no lawyer ever doubted,—the constitution of the United States only incorporated into itself a maxim "embedded in the very elements of the common law" (U. S. v. Gibert [supra]); or if, as other judges have thought,[10] and as seems but rational, the provision of the federal constitution, being general in its nature, and unrestricted in its terms, operates, by the very provisions of the instrument, as well on state courts as on federal. (2) In 1795, in this circuit (U. S. v. Fries, 3 Dall. [3 U. S.] 515), and in a case admitted by Mr. Justice Story to be an authority in point; Mr. Rawle, Dist. Atty., and Mr. Sitgreaves both conceding that "the power to grant a new trial could not be denied." "But," objects Mr. Justice Story, "the clause in the constitution was not even alluded to, much less reasoned out. The court did not, in giving their judgment, in any manner speak to the point," and he thinks that it is not too much to say, "that the court might have been surprised into the decision." This truly is to make trim reckoning of a judicial adjudication, and I have only to say that if, in 1795, judges and counsel like those in that case,—men, all of them, of education and understanding, bred in the apostolic age of our country, and breathing the air of the constitution when it imparted everywhere its energy and spirit,—could not, any of them, see in that constitution aught which touched the case before them, then that no such thing existed there; or, at any rate, that it will not be given to either judge or counsel in these later days to discover it. (3) In 1825, in Indiana (Jerry v. State, 1 Blackf. 395), a state in whose constitution it is admitted that there is a clause like that in the constitution of the United States.

Here, then, are three adjudications, all of which U. S. v. Gibert treats as of no authority at all. And if the language of Mr. Justice Story in that case was in the face of all prior decisions, all subsequent decisions are in the face of it: as (1) In 1837, in Virginia (Ball v. Com., 8 Leigh. 726), where the doctrine asserted by Judge Story was brought directly before the court, and overruled: the judge who had ventured it below concurring with all his brethren in overruling himself above. (2) In 1844, in Alabama (State v. Slack, 6 Ala. 676), where, after commenting on U. S. v. Gibert [supra], the court declares: "It cannot be questioned that the clause was intended for the protection of the citizen; and it would be a mockery to put such a construction upon it as will make it operate to his prejudice."

Each of these five cases is a decision on the point, and I may well leave for others the collection of the many cases where, though a new trial has been refused, the power to grant them has been recognized.

and those many more others in which, without any discussion of the point, a new trial could not have been properly granted, unless the power exists.[11]

As to U. S. v. Gibert [supra], itself, the new trial was refused upon the merits: Judge Davis, the district judge, dissenting from Judge Story on the question of power, and both judges concurring as to the absence of merits. The whole disturbance, therefore, of the criminal system which has been caused in this matter, arises from an extrajudicial dissertation of a single judge; a dissertation, it may be added, not close in point of argument, and far from either respectful or accurate in the consideration of authorities.

The court will not give sentence unless satisfied with the verdict, and how can it be satisfied with the verdict, unless it knows upon what evidence the verdict was given? There is no proof before this court of that evidence. Even had there been no motion for a new trial, the former court would not have given sentence if not satisfied with the verdict. The case is stronger here, because a question was yet pending and undecided as to the propriety of the verdict. In the strongest case (Charles v. State, 4 Port. 107–110) cited on the other side, there was no motion for a new trial, and the question was therefore merely one of the naked power upon on a state of admitted guilt. The exercise of the power is suggested by the court itself as a very different thing; and the court, leaving the straightest line of its duty, stretches forth its hand to give the prisoner that aid which the court below and his counsel had unaccountably omitted to give him.[12]

But, even if judgment were given as to the prisoner found guilty of murder, how is it to be given as to those found guilty of manslaughter, and whose punishment rests in the discretion of the court? You may sentence, it is said, to the lowest measure of punishment, but, unless such sentence be the result of the court's discretion, it is improper. It is said that the prisoner cannot complain, if, deserving a higher degree of punishment, he receives a less. But the United States may,

---

10 See the language of Spencer, C. J., in People v. Goodwin, 18 Johns. 201.

11 See cases of both sorts collected in Mr. Wharton's Treatise on American Criminal Law (pages 623–635).

12 "The facts relied upon in support of the motions," says the court above, "did not affect the power of the court to give judgment in this case, and therefore gave the prisoner no right to be discharged, or to arrest the judgment. Whether the circuit court, in the exercise of a sound discretion, ought not voluntarily, and without a motion from the prisoner, to have granted him a new trial, is a point which that court did not reserve for the consideration of this. It is true, as the counsel of the prisoner affirmed, that Sir Matthew Hale never would give judgment, or award execution, upon a person who had been reprieved by another judge, because he could not know for what reason he had been reprieved: and his rule in this respect has been, in general, observed by his successors." Pages 109, 110.

of salted flesh meat, and one hundred pounds of wholesome ship-bread, for every person on board such ship or vessel, over and besides such other provisions, stores and livestock, as shall, by the master or passengers, be put on board, and in like proportion for shorter or longer voyages; and in case the crew of any ship or vessel, which shall not have been so provided, shall be put upon short allowance, in water, flesh, or bread, during the voyage, the master or owner of such ship or vessel, shall pay to each of the crew, one day's wages beyond the wages agreed on, for every day they shall so be put to short allowance, to be recovered in the same manner as their stipulated wages." The libellants also claimed damages, under the general maritime law, for short allowance of other provisions, flour, rice, vegetables, &c. Under the statute, they claimed three days' extra wages, for each day on which they had a short allowance of the three statute articles. The respondents contended that only one day's extra wages could be given, for each day on which there was a short allowance, whether of one or more articles.

R. H. Dana, Jr., and G. P. Sanger, for libellants.

Wm. Sohier, for respondents.

SPRAGUE, District Judge. I shall not go into the details of the evidence, as I am satisfied, on the respondents' admissions, that they are liable. Putting the most favorable construction upon their answer and evidence, it is clear that they had not on board meat enough for more than two and one-seventh voyages across the Atlantic, and less than that quantity of bread, and a little over three times the quantity of water required for such a voyage. All the evidence shows that a voyage across the Atlantic" is, in distance, 3,000 miles, while a voyage from Calcutta is about 15,000 miles. If the proportion is to be taken from the average length of time, the Atlantic voyage averages about thirty days, and the voyage home from Calcutta about one hundred and twenty days. So that, without deciding which is the proper rule for ascertaining the proportion, either way, and on the most favorable construction, the vessel had not on board the requisite quantity of bread, meat, or water. Upon a comparison of evidence, there is reason to believe that there was considerably less on board than the amounts stated by the respondents; but it is not necessary to go into that inquiry. It is admitted, that none of these provisions were stowed under deck. It has been argued that this is not essential, and does not draw after it the penalty, unless the short allowance is traceable to this cause. But I think it is peremptory and essential, and for good reasons, which have been stated at the bar. Not only might these provisions spoil on deck, but they would be liable to be washed overboard and the crew reduced, at once, to a state of starvation.

The only remaining question of fact is, whether there was a short allowance, and for how long a time. On the first day of January, while off the Cape of Good Hope, and only about sixty days out, the allowance began. It was first one pound of meat, one pound of bread, and three quarts of water per day, to each man. There may be some doubt whether this would be a short allowance, if the crew had other provisions given them, which are usual in the merchant service, and required in the navy, such as flour, rice, &c. But not only the vegetables, but all the small stores allowed the crew, had given out before this time, except the beans, and a little meal, which was sour. In such a state of things, I have no doubt that the above-mentioned allowance was short. It is not necessary to follow the allowance in its stages of reduction, until the bread and beef were exhausted, and relief obtained from other vessels. I am satisfied that the crew were on short allowance from January 1st until April 1st, the time of the vessel's arrival, with the exception of four days. A question now arises on the construction of the statute. There being a deficiency in the quantity put on board, and a short allowance of all of the three statute articles, the libellants claim triple extra wages for each day. I am of opinion that this is the proper rule. The statute separates the articles, and treats them disjunctively; and it is reasonable to do so, otherwise a short allowance of all the articles, at the same time, would entail no greater penalty than of one only. Thus, if all three were deficient for a week, seven day's extra pay only would be recoverable. While if there was a deficiency of only one article, successively for three weeks, which might be a mitigation to the seaman, he would be entitled to twenty-one day's extra pay. The case of Coleman v. The Harriet [Case No. 2,982] has not been followed by other courts. A contrary decision has been made in this district,—The Mary Paulina [Id. 9,224],—and also by Judge Ware in The Mary [Id. 9,191]. In that case, there was no deficiency of water, but only of bread and beef, which are coupled together, and eighteen days' additional pay allowed for a short allowance, during that time. It is not said whether the quantity of beef served out would have been deemed insufficient, if the bread had been abundant. But whether the allowance of one or both those articles was deficient, the decision is inconsistent with that in Coleman v. The Harriet. The question now before me, was not made in the case of The Mary [supra].

The libel also claims damages, under the general maritime law, for deficiency of other articles. I do not think that a recovery under the statute is necessarily a bar to this claim; and in a proper case, damages might be given. But as the statute penalty amounts to a sufficient compensation, I shall not go beyond it.

the subject, have assumed the responsibility of pronouncing sentence of the law upon the prisoners. A careful examination has tended to confirm the original suggestions of his mind; and it is due to him to state that the thorough investigation he has given to the subject, and the able arguments which he has urged in support of his opinion, have gained my hearty concurrence.

KANE, District Judge. The considerations which determine the opinion of the court are altogether independent of any discussion of the reasons filed. It is enough that there is a question of merits, referring itself to evidence that is not before us. We cannot, unless under the coercion of a necessity which admits of no escape, undertake the exercise of a judicial discretion, without legal assurance of the facts by which it should be guided.

It is asserted upon this record by the prisoners that the verdict of conviction was against evidence, and we do not know what the evidence was; that it was against law, and, not being informed of the facts, we cannot know what were the legal principles they invoked; that it was against the charge of the court, which charge we have not seen. We are called on to pronounce the sentence of death against a man whom the judge that tried him may have thought clearly innocent; and to measure out sentences of imprisonment and fine against two others, in terms and amounts resting in our discretion, without judicial information of their grades of guilt. The record which is before us is, of course, barren of facts. The notes of the counsel for the prosecution, made to assist them in argument, but not professing to detail the evidence in the words of the witnesses, still less affecting to portray their spirit and manner,—these, and the columns of an irresponsible newspaper, that gives sometimes the language of the witness, sometimes its import, and sometimes the reporter's opinion of its value, —these, and nothing more, are to form the basis of our judicial action. The notes of the judge who tried the case upon the merits, the certificate of his opinion, if, indeed, he had formed one,—the very material for our review,—these are not before us. The questions presented to us for our solemn judgment depend upon facts which are neither admitted nor proved.

To my mind, the principle of the law is clear. The defendant, before sentence can be pronounced on him, has a right to the judicial determination of his guilt by the court, as well as by the jury. If the verdict does not satisfy the conscience of the judge, the prisoner is entitled to a new trial. After the verdict is rendered, the judicial discretion is still in exercise; and, at any time before the sentence is recorded, it may modify the punishment if the statute has not made it specific, or set aside the convic-

tion altogether. It does not need a motion on the part of the defence. The judge, himself, at the very latest moment, may, sua sponte, award a new trial. This is done not unfrequently in England, if the offence is below the grade of felony; and, in other cases, the English court respites the prisoner till the royal prerogative can either commute the punishment, so as to conform it to the merits, or relieve against the improper conviction by a pardon. In our country, where the powers of the constitution are distributed differently, and the chief magistrate has no part in the judicial administration, the experience of all of us is full of precedents for the grant of new trials upon the suggestion of the court.

The prisoners here were entitled to the advantage of this judicial revision, from the judge who sat upon their trial; and whether we will intend in favorem vitæ, that he was disinclined to pronounce the capital sentence, or whether we content ourselves with an admission of the fact that the time in which this judicial discretion might be exerted had not yet expired, we cannot affirm, in either case, that Judge Randall was content to enter judgment on this verdict. Even were we now satisfied what were his opinions at the time of his decease, we should be without just and legal assurance that they might not have been modified by after reflection, and before the appropriate moment for recording them. I had no wish, therefore, to hear the evidence, which it was intimated at the argument was perhaps within our reach, of the views confidentially expressed by Judge Randall. A judge's opinions become operative only when they are solemnized by their assertion from the bench.

I have alluded incidentally to the diversity between our practice and that of the English courts, on the subject of new trials after convictions for felony. I cannot doubt that this diversity exists, and that it has its foundation in sound reason, and the differing character of our institutions. I do not review the American cases that establish it, only because this has been perfectly well done in a recent treatise by a member of our own bar. Whart. Am. Cr. Law, pp. 623–635.

But there is a reason for our departure from the English rule, which is to my mind conclusive. The British constitution, like the common law, is made up in a great degree of principles inferred from long continued usage. Among these is the combined attribution to the sovereign, as the fountain at once of justice and mercy, of the power and the duty to apportion punishment to the guilty, and to shield the innocent from wrong. Whatever assurance the English people have that the other powers of sovereignty shall be rightfully exercised, they have in regard to this. It is surrounded by the same safeguards against non-user as

well as against abuse. I do not remember to have read of a single instance in which the judicial recommendation has been disregarded by the ministers of the crown, and I do not suppose that it could be without a breach of the constitution of the realm. In England, therefore, the denial to the courts of a revisory power over verdicts in any cases is apparent, rather than real. The judge, if dissatisfied with a conviction on the merits, respites the sentence or reprieves the prisoner, and the king's prerogative interposes to do justice as a thing of course. If there be a doubt upon any point or proceeding connected with the case, such as with us would be reviewed on a motion for new trial, the judge reserves the question, it is argued by counsel upon his report before the twelve judges, and the action of the king is determined by their advice. Indeed, the pardoning power in England is so entirely regarded as forming part of the justical administration, that from the time of the statute of Gloucester (chapter 9), down to the present day, the right of a prisoner to demand a pardon, under certain circumstances, has been expressly and repeatedly affirmed by acts of parliament. Hawk. P. C. bk. 2, c. 37.

It is unnecessary to refer to our American constitutions to show that the power of pardoning as conferred by them, in consequence of the absolute and entire separation of the judicial from the executive departments, and the exclusion of the former from the right to grant reprieves, cannot relieve a judge from the responsibilities of an erroneous or improper conviction. With us, therefore, the new trial becomes an indispensable resort.

I am aware that one of the most eminent of our jurists (Story, J., in U. S. v. Gibert [supra]) has found an inhibition in the constitution against the grant of new trials in cases involving jeopardy of life. But I cannot realize the correctness of the interpretation, which, anxious to secure a citizen against the injustice of a second conviction, requires him to suffer under the injustice of a first. Certainly I would not subject the prisoner to the hazards of a new trial without his consent. If, being capitally convict, he elects to undergo the sentence, it may be his right, as it was, to have pleaded guilty to the indictment. When, however, he asks a second trial, it is to relieve himself from the jeopardy in which he is already; and it is no new jeopardy that he encounters when his prayer is granted, but the same, divested of the imminent certainty of its fatal issue.

Reference is also had to the rule of the common law, as it stood when the constitution was adopted; and the language of the judiciary act is supposed to present a further difficulty, inasmuch as it limits the power of granting new trials to cases in which there are "reasons for which new trials have usually been granted in courts of law." Act Sept. 28, 1789 [1 Stat. 73]. But within the limits of this circuit, at least, from the earliest judicial date to the present time, there has been no recorded case in which a new trial has been refused for the want of authority in the court to grant it. The circumstances of the present case are novel, and in one sense, therefore, the reasons for a new trial may be said to be unusual. But our power cannot be qualified by the absence of precedent, if the principles of accustomed and essential justice invite our action.

It is the characteristic excellence of the common law that it adapts itself to the circumstances of men, and makes progress with the age. Its principles, legitimate deductions of right reason, are, of course, invariable; but its rules of conduct and its modes of procedure change with the social and intellectual condition, which it is their office to supervise and protect. Time and advancing freedom of mind have modified the barbarous usages and penal inflictions that characterized at one period the administration of criminal justice. The law of contracts has expanded with the necessities of expanding commerce. The rights of conscience and of political and civil liberty have been developed, and have found safeguards. But through all these changes the great principles of the common law have remained the same. Our ancestors brought this law with them, in all its capacities of adaptation and expansion. They abrogated none of its principles, when they emancipated their lands from the feudal tenures, and their liberties from hereditary rule. They adapted its rules to their circumstances, but they left its principles unchanged. They claimed it as an inheritance for themselves, not only,—a scanty band of emigrants on a savage continent,—but for their posterity, enriched, powerful, and free; and they transmitted it to us with all that flexibility to the varying exigencies of men which had so signally commended it in their own experience. It is of little moment, and always has been, what are the forms of the common law, whether declared by regulation or inferred from usage. They are the means, not the end; and, so soon as they fail to secure the great objects of the law itself,—enlightened and substantial justice,—the form must give way to the principle.

I have looked with some care through the English books, but have not been surprised to find that they supply few materials for reference on this question. In fact the organization, as well as the practice, of the English courts is such that a case like this, in all its circumstances, can scarcely, by possibility, occur there. Yet I have found enough to satisfy me that, where those courts are vested with a discretion as to their action on a verdict, that discretion

is never exercised without unequivocal, direct, judicial knowledge of the facts disclosed on the trial. Either the action upon the verdict is by the same court before which it was rendered, or all the facts that are not patent on the record come up by formal certificate from the judge who heard the evidence. The only case that we read of in which this caution was disregarded is that which is commemorated in the note of Sir Matthew Hale, and on which he seems to have grounded his rule "never to give judgment or award execution upon a person reprieved by any other judge but myself, because I could not know upon what ground or reason he reprieved him." 2 Hale, P. C. p. 406, c. 56.

At the common law, before the statutes of 11 Hen. VI. (chapter 6), and 1 Edw. VI. (chapter 7), if a prisoner had been convicted before commissioners of oyer and terminer, and a new commission issued before the award of execution, no judgment could be entered or execution ordered by their successors. "And there was," says Mr. Chitty (1 Cr. Law, 697), "some reason for this restriction; for the subsequent judges were unacquainted with the circumstances of the case as developed on the trial, and might, therefore, unconsciously be the occasion of injustice."

In the case of Rex v. Baker, Carth. 6, where there had been a conviction by verdict of speaking seditious words, which was removed by certiorari into the king's bench, it was said that that court "never gives judgment on a conviction in another court; but the practise is, after issue joined in another court, and the indictment removed, always to admit the party to waive the issue below, and to go to trial upon an issue joined in this court;" and in that case "the court directed a new trial, and Baker was found guilty by a second verdict." On the authority of this same case, the court, in the case of Rex v. Nichols, 13 East, 412, note, refused to sentence on conviction for conspiracy in an inferiour court, which had been brought up by certiorari between verdict and judgment, on the ground that, "the fine being discretionary in the court, upon the circumstances of the case as it appeared in evidence upon the trial, the justices who tried the merits are the only proper judges to assess the fine."

The same principle is recognized in the case of Warrain v. Smith (king's bench) 2 Bulst. 147, where it is said by Coke, C. J., referring to the Case of Sutton's Hospital [10 Coke, 1a], that in the exchequer chamber, if one of the judges die pending the argument, and another be appointed after the argument had, he shall not give his opinion in the case.

The only case I have found in which execution was awarded by the court of king's bench, when it had only the record for its guide, is that referred to by Sir John Strange in his argument in Rex v. Nichols, already referred to. It was the case of a capital conviction, brought up by certiorari from one of the counties. But the learned counsel who cited it admitted that it was distinguishable from the other cases, in this: that "the judgment was certain, and no discretionary power in the court,"—circumstances that distinguish it also from the present case, since as to two of these defendants the judgment is not certain, and, if I have reasoned rightly, the court has a discretionary power as to all.

The order of the court is that a new trial be granted to Harding, and that, as to Grimes and Williams, the case be continued for one week, at the expiration of which they are to elect whether they will take a new trial, or abide by their former conviction.

GRIER, Circuit Justice, then addressed Grimes and Williams as follows: William Grimes and John Williams—You ought clearly to understand and weigh well the position in which you now stand. You have been once tried and acquitted of the higher grade of offence charged against you in this indictment, the penalty affixed to which is death; but you have been convicted of the minor offence of manslaughter. Your lives have been in jeopardy, and you have escaped. The constitution of your country declares that "no person shall be twice put in jeopardy of life or limb for the same offence." This is to shield you against oppression and injustice, and puts it out of the power of the court to subject you to the danger of another trial, except at your election and request. We believe that you have a right to waive the protection thrown around you by the constitution, for the sake of obtaining what may seem to you a greater good. But let me now solemnly warn you to consider well the choice you shall make. Another jury instead of acquitting you altogether, may find you guilty of the whole indictment, and thus your lives may become forfeit to the law. If you choose to run this risk, and to again put your lives in jeopardy, it must be by your own act and choice, being neither compelled nor advised thereto by the court; and when your solemn election shall have been put on record, the court will hold you forever after estopped to allege that your constitutional rights have not been awarded to you.

Before we enter of record an order for a new trial as to you, we will give you one week to ponder carefully on this subject, and consult with your counsel as to what will be your safest and best course.

On a subsequent day, these two prisoners appeared in court, and, being called upon to make their election whether to take a new trial or abide by the former conviction, declared their determination to take a new trial. The whole of them were afterwards tried anew, and a verdict of guilty of manslaughter was found

against Harding and Grimes, and Williams was acquitted.

Harding was sentenced to three years imprisonment and fine of $1. Grimes to one year imprisonment and a like fine.