**Ex parte UNITED STATES.**
**No. 6770, Original.**

Circuit Court of Appeals, Seventh Circuit.
Feb. 15, 1939.

John Henry Lewin, W. P. Crawford, and Grant W. Kelleher, Sp. Assts. to Atty. Gen., George W. Wise, Sp. Atty., Department of Justice, of Washington, D. C., and Thurman Arnold, Asst. Atty. Gen., for the United States.

Weymouth Kirkland, John L. McInerncy, and David Fisher, all of Chicago, Ill., for respondent.

J. C. Denton, R. H. Wills, and J. P. Greve, all of Tulsa, Okl., amici curiæ.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

The United States (petitioner) is here applying for a writ of mandamus requiring the Honorable Patrick T. Stone, District Judge, sitting in the United States District Court for the Western District of Wisconsin, to set aside two orders and to direct new trials as to certain defendants in the criminal case of United States v. Standard Oil Company of Indiana et al.[1] The order of July 19, 1938 was in the form of a judgment non obstante veredicto.[2] The order of September 21, 1938 amended the former order so as to show that the judgment non obstante veredicto was pursuant to a reserved ruling on motions for directed verdicts of acquittal. The case is here for decision upon the return of the District Judge (respondent) to a rule to show cause why the application for the writ should not be granted. The facts follow.

The government started its prosecution in the case of United States v. Standard Oil Company of Indiana et al., supra, on October 4, 1937. Evidence was adduced before court and jury for a period of over three months.[3] On January 17, 1938, after all the evidence was in, motions for direct-

---

[1] District Court, 23 F.Supp. 937, 24 F. Supp. 575. Notice of appeal was filed July 20, 1938. Case is pending in Circuit Court of Appeals, Seventh Circuit, docket number 6721.

[2] The term "judgment non obstante veredicto," as used in this opinion, means any judgment notwithstanding the jury's verdict.

[3] This criminal prosecution involved an indictment charging that certain major oil companies, corporate officials, and others had engaged in a conspiracy to fix and control retail prices of gasoline (a

ed verdicts of acquittal based on the insufficiency of the evidence were duly presented by forty-six defendants. On the same day, the respondent expressly reserved his ruling on these motions until after the verdict of the jury.[4] On January 21, when the jurors retired, the respondent by ex parte order denied these motions.[5] On January 22, the jury returned verdicts of guilt against all of the defendants.

Thereafter, the defendants moved to set aside the verdicts and to dismiss the indictment. During the ensuing hearing, argument predicated on the theory that the respondent had reserved his ruling on the motions for directed verdict was made.[6] Respondent then entered his or-

der of July 19 rendering eleven judgments in form non obstante veredicto.[7]

The government in turn filed a petition to rescind and expunge the order of July 19 on the ground that the court lacked the power to render a judgment non obstante veredicto. Petitioner, however, in the recital of facts stated that respondent had reserved his ruling on the motions for directed verdict. In the meantime, respondent on his own motion had entered two nunc pro tunc orders modifying the record. On August 4 he ordered an amendment of the order of January 21 so as to show that the denial of the motions for directed verdict had been made subject to the court's reserved ruling after the verdicts.[8] On September 21, he or-

---

violation of the Sherman Anti-Trust Act, 15 U.S.C. Sec. 1, 15 U.S.C.A. § 1). On November 15, 1937, at the close of the Government's case, the Court directed certain verdicts of acquittal. At the close of all the evidence, forty-six defendants remained.

[4] Counsel: " * * * I assume your honor will follow your practice and hear arguments on it after the verdict."

Court: "Yes."

Court: "Yes, let the records show motions for directed verdicts have been filed on behalf of all defendants, and the ruling thereon reserved by the Court until some later date."

[5] There is disagreement as to whether this order was signed prior or subsequent to the retirement of the jury. The order was entered upon ex parte application by one of the many defense attorneys. It was uncontested, made without notice to the government, and signed without a hearing on the merits of the motions for directed verdict. Twenty-six defense attorneys either lacked knowledge of the order or understood that it was qualified by the reservation of January 17. Petitioner knew nothing of the order as late as August 1. On January 22, the following ambiguous colloquy transpired:

Counsel: "Is your Honor going to set a date for hearing on the motions for directed verdict?"

Court: "I am not going to do it now—well, counsel the other day requested that —I have passed on that, or I have filed that. But the same questions can be brought before the Court on your present motions."

Respondent explained that he signed the order of January 21 because he thought it was necessary for purposes of the record. He explained that by the response

in the January 22 colloquy he meant that he would consider the reserved motions for directed verdict at the same time that he would consider the motions after verdict.

[6] Twenty-six affidavits by defense counsel indicate that counsel understood that respondent had reserved his ruling. Three affidavits by government counsel indicate that counsel understood that respondent had not reserved his ruling. The order of July 19, however, was captioned "Order on Motions after Verdict", and the judgment was one non obstante veredicto without qualification. Yet during the argument Government counsel did not suggest any doubt as to whether respondent had reserved his ruling. Government counsel contend that at this time (March 28–April 1) the government did not know of the order of January 21.

[7] This order of July 19 sustained verdicts of guilty as to twelve corporate and five personal defendants, granted new trials as to three corporate and fifteen personal defendants, and dismissed the indictment as to one corporate and ten personal defendants.

[8] "It having appeared to the Court that an order was presented to the Court on January 21, 1938, denying the motions for directed verdicts * * *, and whereas it was the intention of the Court, as the record shows, to reserve its ruling on the questions of law incident to said motions * * *, to be passed upon after the verdict of the jury, as of the time the motions were made, and the Court being of the opinion at all times that it had reserved rulings * * *.

"And the Court being now of the opinion that the record should be amended so as to truly reflect the intention of the Court to pass upon said questions of law

dered an amendment of the order of July 19 so as to show that the judgment non obstante veredicto has been rendered pursuant to his reserved ruling on the motions for directed verdicts of acquittal.[9] On September 22 the rescinding and expunging petition was denied by respondent.[10] Thereupon petitioner applied in this court for a writ of mandamus requiring respondent to set aside the orders of July 19 and September 21 and to direct new trials for the eleven defendants.

Petitioner's application for a writ of mandamus is based fundamentally on the theory that, although respondent had the power to set aside the verdicts for insufficiency of the evidence, he lacked the power to dismiss the defendants. From this counsel argue that respondent has placed himself in a position where only the power to direct new trials remains open to him. We agree with petitioner that power to dismiss is the real question here and that in the absence of such power the writ of mandamus must issue. First it is necessary, however, to ascertain what power exercised by respondent is the target of condemnation.

The record as it stood prior to the rectifying nunc pro tunc orders of August 4 and September 21 presents some confusion as to the exact procedural step taken by respondent during the trial. Respondent in his answer to the rule to show cause explained that he reserved his ruling on the motions for directed verdict. Under the rule announced in Thatcher v. Killits, 6 Cir., 195 F. 471, a respondent-judge's answer in a mandamus suit is conclusive as to the facts alleged therein. However, we do not think that it is necessary to resort to this general rule in an effort to reach the same result justifiably.

Affidavits by counsel on both sides indicate considerable disagreement and disturbance as to whether respondent in fact reserved his ruling until after the return of the jury. On January 17 he expressly reserved his ruling and added that he would hear arguments on the motions at a day subsequent to the return of the jury. On January 21, when the jurors retired, he signed an ex parte order denying the motions for directed verdicts, without considering the merits thereof and without hearing argument thereon. Government counsel contend that the order was absolute and point for support to the judgment of July 19 which is non obstante veredicto in form. Respondent's counsel contend

---

after the verdict of the jury, as of the time the motions were made,

"Now, therefore, it is ordered * * *"

[9] "This cause having been further considered by the Court upon the petition of the United States of America to rescind and expunge the order of this Court of July 19, 1938 * * *, the Court is of the opinion that said order is not sufficiently clear and certain, and

"Whereas the Court intended to and did reserve rulings on the motions to dismiss the indictment and for a directed verdict * * * at the close of the case, as the transcript clearly shows, and as the order of August 4, 1938, amending the order of January 21, 1938, denying said motions now shows; and

"Whereas the Court desires to make it perfectly clear and certain as to the procedure it followed and the judgment it intended to enter does hereby; and

"It is therefore ordered, adjudged, and decreed * * *."

[10] The Court based its action on the ground that it had power to render judgments non obstante veredicto pursuant to its reserved ruling on motions for directed verdict. On pp. 359–360 the Court recited the facts concerning the reservation to be as follows:

"At the close of the testimony, motions were made * * * for a directed verdict. While the Court was of the opinion that in some cases the motions were well taken, the testimony was so voluminous, the exhibits so extensive in number, that it seemed impelling that no ruling on the motion be made until there was opportunity for a thorough study of the evidence, and a careful and deliberate consideration of the law, with the aid of arguments and briefs. The jury had been sequestered from October, 1937, to January, 1938 * * * and to hold it for a further time sufficient to permit the Court to rule properly, seemed a further hardship * * *. Under these circumstances, and with full knowledge and acquiescence of counsel for all parties, the Court denied the various motions for directed verdict under an explicit reservation of its ruling on the question of law incident thereto, with the right to pass on the questions of law after verdict, as of the time made * * *. Not only was no objection made to this procedure, except by one of the counsel for some of the defendants, but there was no suggestion from anyone that the Court might lack the power to reserve its ruling on these questions of law, or that the practice was in any way out of the ordinary. * * *"

that the order was qualified by the express reservation of January 17 and point for substantiation to argument based on the postponed motions for directed verdict.

 We believe that the ex parte character of the order of January 21 alone is sufficient to preclude any justifiable conclusion that in substance it was absolute and unconditional. We are satisfied, from the complete picture of circumstances enveloping the procedural action in question, that if any weight is to be given the order of January 21, it will have to be in connection with the uncontradicted reservation of January 17, made before all the parties and their counsel without objection. We conclude, therefore, that respondent in fact reserved his ruling on the pre-verdict motions and that as a consequence he was exercising his clear discretionary power in eliminating the embarrassment and confusion that had arisen. Thus, petitioner cannot impeach the nunc pro tunc order of August 4, which merely connects the reservation of January 17 with the order of January 21. Nor can petitioner challenge the nunc pro tunc order of September 21, which merely modifies the July 19 judgment from one in form non obstante veredicto to one non obstante veredicto made pursuant to a reserved ruling. At the most these errors were errors of form or of inadvertence not unusual in view of the length of the case involved. Respondent exercised his inherent power in making the record more clearly speak the truth. Unless a trial court clearly abuses its discretionary powers, an appellate court will refrain from disturbing orders of modification and amendment, which seek only to make the record speak the truth.

The record reveals that in the criminal case motions for directed verdicts of acquittal were made by forty-six defendants on the ground of insufficiency of the evidence. The court then reserved its ruling and submitted the case to the jury subject to the ultimate ruling on the legal question reserved. After the jury's return of guilt, the court considered the motions requesting directed verdicts of acquittal, and rendered judgments of dismissal as to eleven defendants. It is therefore necessary to decide, not only whether this procedure violates the constitutional guaranty of trial by jury, but also whether the trial court had power to discharge the defendants pursuant to its reservation of the determination of the legal insufficiency of the evidence.

 In the administration of justice in England there came a transition from the local justice of the Anglo-Saxons to the King's justice of the Tudors and Stuarts. During the transition period trial by might was superseded by trial by court machinery in the form of a judge and jury. As time went on, the line of demarcation between the province of the judge and the province of the jury was being drawn. The guiding principle was later enshrined in our American Constitution.[11] Ad quaestionem facti non respondent judices, ad quaestionem juris non respondent juratores.[12] The constitutional guaranty restrains the lay jury to the limited and special role of determining controverted issues of fact. Questions of law, methods of practice, and points of procedure are exclusively the province of the judge. Thayer, A Preliminary Treatise on Evidence at the Common Law, (1898), pp. 183–262, 217.

Although the limits of the constitutional maxim have varied from time to time, one important issue—the legal sufficiency of the evidence—required judicial attention from the start. Ordinarily, the judge exercised the power to pass on this legal

---

[11] U.S.C.A.Const. Art. 3, Sec. 2: "The Trial of all Crimes * * * shall be by Jury."

Amendment 6: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury * * *."

Cf. Amendment 7: "In suits at common law * * * the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

[12] In criminal cases, this principle that juries must answer to questions of fact and judges to questions of law has several qualifications. The doctrine is ancient that one shall not be put twice in jeopardy of life or limb for the same offense. A verdict of acquittal shall not be set aside. The court shall not direct a verdict of guilty. King v. Dean of St. Asaph, 3 T.R. 428; Forsyth, Trial by Jury, (1852), pp. 261, 262, 282; Sparf v. U. S., 156 U.S. 51, 15 S.Ct. 273, 39 L. Ed. 343; Patton v. U. S., 281 U.S. 276, 288, 289, 50 S.Ct. 253, 74 L.Ed. 854, 70 A.L.R. 263.

question during the trial.[13] Frequently, however, he would resort to the practice of reserving the issue of law until after the return of the jury.[14] If after consideration he decided that the conditional verdict of guilt was unjust on the ground of legal insufficiency of the evidence, he would dispose of the whole case by recommending royal clemency.[15] In civil cases the normal procedure was by judgment non obstante veredicto. Baltimore & Carolina Line v. Redman, 295 U.S. 654, 659, 660, 55 S.Ct. 890, 79 L.Ed. 1636. However, at the common law, neither procedure, although non obstante veredicto in substance, invaded the province of the jury.

In this case, the guilt or innocence, as far as the eleven defendants are concerned, is not in issue. That there was insufficient evidence to convict must be presumed. In other words, in this case there was no fact to be tried by the jury.[16] The nature of the legal question involved was not altered by the jury's verdict of guilt. By virtue of the reservation, the issue of law was preserved inviolate despite the verdict of guilt. It is plain that the procedure of dismissing the defendants pursuant to the reservation did not in any way disturb the settled line of distinction between the province of the judge and the province of the jury. If the right to a trial by jury is not denied when the jury is directed to find a particular verdict, it is difficult to see how any such right is denied by a judgment of dismissal made pursuant to a reserved ruling on motions for directed verdict. In fact, to allow the verdict of guilt to stand as to the eleven defendants is tantamount to giving permission to the jury to invade a judicial power.

It is true that at common law the disposition of the case was by judicial recommendation for pardon rather than by judicial dismissal. Either method, however, enforced the division of the functions between court and jury.[17] There is no violation of the Constitution because

---

[13] For collection of authorities on the common law practice, see Sparf v. U. S., 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343. When juries at common law refused to find as directed by the court, the court would often punish them by fine or imprisonment. Thayer, Preliminary Treatise, pp. 137, 139, 161, 163, 165 (1898). For modern procedure, see U. S. v. Fullerton, 25 Fed. Cas. 1225, No. 15,176; Nosowitz v. U. S., 2 Cir., 282 F. 575; Cady v. U. S., 54 App.D.C. 10, 293 F. 829.

[14] The practice of reserving points of law grew out of the practice of obtaining special verdicts. Thayer, Preliminary Treatise, pp. 217–219; Chitty, Criminal Law, (1819), vol. 1, pp. 437–445.

[15] Rex v. Isaac Cockwaine, 1 Leach 498; Rex v. Parkes & Brown, 2 Leach 776; Rex v. Joseph Bazeley, 2 Leach 835.

Stephen, History of the Criminal Law of England, (1883), vol. 1, p. 311: "If they (the judges who considered the reserved legal question in the criminal case) thought that the prisoner had been improperly convicted he received a free pardon. If not, the sentence was executed or judgment was passed. No judgment was delivered and no reasons were given in such cases, the whole proceeding being of an informal kind." But the discharge by pardon came as a matter of course at the recommendation of the judges. U. S. v. Harding, 26 Fed.Cas. 131, 137, No. 15,301: "I do not remember to have read of a single instance in which the judi-

cial recommendation has been disregarded by the ministers of the crown, and I do not suppose that it could be without a breach of the constitution of the realm. * * * And the king's prerogative interposes to do justice as a thing of course. * * * And the action of the king is determined by their [the judges'] advice."

[16] It would have been proper to direct a verdict of acquittal in behalf of these eleven defendants. In such cases, the form of entering a verdict does not mean that the jury tried a question of fact. That is not what is meant in the Constitution by a trial by jury. The case is said to be "withdrawn" from or "not submitted" to the jury. Carter v. Carusi, 112 U.S. 478, 484, 5 S.Ct. 281, 28 L.Ed. 820; Sparf v. U. S., 156 U.S. 51, 105, 15 S.Ct. 273, 39 L.Ed. 343.

[17] The rules announced in civil cases indicate the true test for determining the respective functions of court and jury. See Sparf v. U. S., 156 U.S. 51, 100, 15 S.Ct. 273, 39 L.Ed. 343. In Collenger v. U. S., 7 Cir., 50 F.2d 345, 346, this court followed the civil procedure in determining the proper criminal procedure. For the constitutionality of the procedure in question in civil cases, see Baltimore & Carolina Line v. Redman, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636. In civil cases, the Seventh Amendment provides that "no fact tried by a jury shall be otherwise re-examined than according to the rules of the common law."

old methods of effecting the division of functions are superseded by modern methods more readily intended to effect the division of functions without delay. Twining v. New Jersey, 211 U.S. 78, 101, 29 S.Ct. 14, 53 L.Ed. 97. To survive, our system of trial by jury must be capable of adaptation to present needs and amenable to the proper administration of justice.

 There being no valid constitutional objection to the procedure followed by respondent, consideration is now directed to the source of his power. It is true that no federal statute specifically sanctions the procedural action taken by the trial court. On the other hand, there is no legislation of Congress which forbids the adoption of such procedure.[18] The absence of legislation justifies resort to the procedures known at common law. In the absence of express prohibitive legislation, United States courts observe the common law procedure in criminal cases, as modified by the state in which the trial is held, and as of the date that state was admitted into the Union. Holmes v. U. S., 5 Cir., 269 F. 96; Logan v. U. S., 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed 429; Wolfle v. U. S., 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617.

From time immemorial, in the common law courts of England, it had been the function of the trial court to determine the legal sufficiency of the evidence. To carry out this important function it was proper for the trial court in civil and criminal cases to direct a verdict, and in civil cases to discharge the defendant pursuant to a reservation of the legal question. Since the procedure in civil and criminal cases tended to move along the same level, it is surprising to find that in criminal cases the court did not exercise this post-verdict power to discharge by judgment. Sparf v. U. S., 156 U.S. 51, 100, 15 S.Ct. 273, 39 L.Ed. 343; Stephen, History of the Criminal Law of England, (1883), Vol. 1, p. 506; Chitty, Criminal Law, (1819), Vol. 1, p. 381. Instead the court in criminal cases discharged the accused by recommending a pardon, which issued as a matter of course. Stephen, supra, p. 311; U. S. v. Harding, 26 Fed. Cas. 131, 137, No. 15,301. We do not believe that this difference in the discharging phase of the procedure—procedure used in civil and criminal cases to rule on the legal sufficiency of the evidence—indicates an absence of power on the part of the trial court in criminal cases. The fact that the discharge by judgment was common in civil cases militates against the want of the same power in criminal cases.

We believe that the procedural difference merely reflected the struggle between king and judiciary.[19] During the long reigns of the Tudors and Stuarts subserviency to royal wishes conditioned judicial tenure. Judicial functions and procedures were often hampered by Crown interferences. The influences of the Crown, however, were confined largely to criminal cases. As between one private citizen and another, there was no incentive to interfere, and the procedural law in civil cases was permitted to work toward even-handed justice. In criminal cases, on the other hand, the judge naturally was reluctant to incur the disfavor of the king by discharging an innocent prisoner by judgment after a verdict for the Crown. An adjustment between tribute

---

If the practice is constitutional in civil cases, it would seem to follow that it is in criminal cases. Article 3 and the Sixth Amendment contain no limitations as to re-examination and the common-law.

18 Petitioner contends that a judgment non obstante veredicto pursuant to a reserved ruling on pre-verdict motions is affirmatively prohibited by federal legislation. Petitioner refers to Rules 1 and 2 of the Rules of Practice and Procedure authorized by 48 Stat. 926, Title 28, U.S. C.A. Sec. following section 723a. These rules govern criminal procedure after verdict of guilt and refer specifically to post-trial motions. The procedure sought to be condemned in the instant case is wrapped around a pre-verdict motion. But even if Rules 1 and 2 were applicable, they do not limit the procedural power of trial courts. The purpose of Rules 1 and 2 was to force speedy termination of criminal proceedings and to expedite appeals. Berkowitz v. U. S., 8 Cir., 90 F. 2d 881. These rules are made not for the benefit of the litigant who invokes them, but are made to serve the general good by simplifying and expediting trials. Unless the violation of a Rule of Procedure by the Court is fundamental, the litigant should not be allowed to complain.

19 Select Essays in Anglo-American Legal History, by the Association of American Law Schools (1907–1909). Volume 1, pp. 625–729; in particular, see pp. 688, 690, 708. Volume 2, pp. 443–530; in particular, see pp. 514–515, 520–525.

to the interest of the king and regard to the proper administration of justice was judicial recommendation for pardon.

The American Revolution released this country from the conditions underlying the struggle between king and judiciary. In our Constitution judicial power was established on a parity with executive power, and the dead hand of the Crown (inducing non-exercise in criminal cases of the power of dismissal pursuant to a reservation of a legal question) was gone forever. Since the only valid reason for the difference in civil and criminal procedure concerning the matter here in question had disappeared, there was no longer present any reason why the procedures might not be the same. Cessanti ratione legis, cessat ipsa lex. It is certain that the identical procedure prevalent in criminal cases during the times of Coke was not fastened upon our courts "like a strait-jacket," "incapable of progress or improvement." Twining v. New Jersey, 211 U.S. 78, 101, 29 S.Ct. 14, 53 L.Ed. 97. On the contrary, there exists "flexibility and capacity for growth and adaptation." Hurtado v. California, 110 U.S. 516, 530, 4 S.Ct. 111, 118, 28 L.Ed. 232.

■■■ Varying conditions in the new world soon justified changes in the common law as known during the times of Lord Coke. Criminal practice and procedure did not remain static. The fact that motions for directed verdict were unknown to the common law of old England did not preclude their use by the federal trial courts. U. S. v. Fullerton, 25 Fed. Cas. 1225, No. 15,176. In the eighteenth century motions for new trial were made in civil cases but not in criminal cases.

This situation did not prevent the federal trial courts from adopting the same procedure for use in criminal cases. U. S. v. Plumer, 27 Fed. Cas. 551, 572, No. 16,055. U. S. v. Harding, 26 Fed. Cas. 131, 136, 137, No. 15,301. Courts look to the spirit of modern legislation, and to the trend of decisions both federal and state to determine what is the true and enlightened rule. Funk v. U. S., 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369, 93 A.L.R. 1136; U. S. v. Wood, 299 U.S. 123, 57 S.Ct. 177, 81 L.Ed. 78; Patton v. U. S., 281 U.S. 276, 50 S. Ct. 253, 74 L.Ed. 854, 70 A.L.R. 263.

■■■■ Although it is our belief that the mere fact that the procedure here in question was known and exercisable by trial courts at the common law prior to the American Revolution (although used only in civil cases) sanctions exercise by the respondent if the constitutional guaranty is not offended thereby, it is not necessary to rest our conclusion thereon. Respondent was authorized to observe the common law procedure in criminal cases, as modified by the state practice as of the date that the state was admitted into the Union.[20] The supreme court of Wisconsin, the state wherein the trial was held, has spoken in the following manner as to the modified common law procedure in criminal cases: "The effect of discharging the defendant for want of sufficient evidence is in legal effect the same as a verdict of acquittal by jury on a verdict of acquittal directed by the court. * * * That the court had the right to make such an order [a judgment non obstante veredicto] and that it is final in the case is recognized in the state."[21] Section 722 of the Revised Statutes of the United

---

[20] Holmes v. U. S., 5 Cir., 269 F. 96; Logan v. U. S., 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429. 6 Hughes, Federal Practice, (1931), Sec. 3730: "* * * * In determining what the rules of the common law are the federal courts should be greatly influenced by the decisions of the highest courts of the states in which they administer criminal justice * * * *". See also U. S. v. Kilpatrick, D.C., 16 F. 765; U. S. v. De Bolt, D.C., 253 F. 78.

[21] State v. Meen, 171 Wis. 36, 176 N. W. 70, 71. Petitioner contends that the trial court in the Meen case did not reserve its ruling on the motions for directed verdict. Consequently counsel argue that the court rendered a judgment non obstante veredicto—a procedure which is not authority for a judgment non obstante veredicto pursuant to a reserved ruling on motions for directed verdict, and a procedure which is outlawed by Collenger v. U. S., 7 Cir., 50 F.2d 345. We disagree with petitioner. The procedure involved in rendering a judgment non obstante veredicto is authority for procedure involved in rendering a judgment non obstante veredicto made pursuant to a reserved ruling. The facts in the Meen criminal case might lead justifiably to the conclusion that there had been a reservation. This Court in the Collenger case adopted the procedural rule applicable in civil cases at the time, and as a result condemned a judgment non obstante veredicto made without reservation. The instant case of a judgment non obstante veredicto made pursuant to a reservation is not in conflict with the Collenger case.

States, which today primarily governs the criminal procedure of federal trial courts, provides that the trial court can follow the Wisconsin state practice, so long as that practice is not offensive to the constitutional guaranty of trial by jury. Title 28, Sec. 729, U.S.C. 28 U.S.C.A. § 729. That the procedure in question does not violate the Sixth Amendment to the Constitution already has been shown.

Although we have shown that both the common law of England and the modified common law of Wisconsin authorize the procedure taken by respondent, we believe there is a better sanction. We think that the trial court possesses inherent power to render a judgment of dismissal pursuant to the reservation of an issue of law, when deemed essential by it for the proper administration of justice. In the absence of prohibitive legislation courts have inherent power to provide themselves with appropriate procedures required for the performance of their tasks. Ex parte Peterson, 253 U.S. 300, 312, 313, 40 S.Ct. 543, 64 L.Ed. 919; Funk v. U. S., 290 U.S. 371, 381–384, 54 S.Ct. 212, 78 L.Ed. 369, 93 A.L.R. 1136. As we have already seen, the constitutional guaranty does not in this case stand in the way of doing after trial what could have been done at the trial. There has been no encroachment on the proper province of the jury. The essence of legal power is to take the case away from the jury, where there is an insufficiency of evidence to sustain a conviction. The power to direct a verdict and the power to render a judgment of dismissal pursuant to the reservation of the legal question are clearly incidental to, and necessarily flow from, the judicial function of determining the legal sufficiency of the evidence. The court has inherent power to invoke these procedural aids in its effort to administer criminal justice. That the latter aid is adopted from the civil procedure is immaterial. That it is a better tool than the power of directing verdicts of acquittal is clear in criminal cases of this nature. That it is a better tool simply compels recognition of the reasonableness of the trial court's discretion.

To agree with petitioner that the prosecution is entitled to a new trial as a matter of right, after the issues have been fully tried in a trial by judge and jury and after the government has failed to prove its case against the defendants, is a monstrous penalty to impose upon the defendants. To grant the prosecution a new trial, after a judgment of dismissal has been rendered pursuant to its reservation of the power to wrest the case from the jury if the case turned on a purely legal question, is to create a right that never before existed. The creation of such a right in this case would come very close to violating the ancient doctrine codified in our Constitution that the accused shall not twice be put in jeopardy of life or limb for the same offense.

To hold that respondent possesses this procedural power is not to open the door to unseen evils. At the most this power is tantamount to the power of directing a verdict of acquittal. There is only a mere postponement of a ruling on the motions for directed verdict. To say that mere postponement of a ruling in favor of the defendants bars the ruling completely is going beyond all bounds in giving the Government a right based purely on a change in procedural form. In substance there is no difference between a directed verdict of acquittal and a judgment of dismissal. It is only when the procedural change is fundamental and substantial injustice occurs that one of the litigants should be allowed to complain. In this case the Government, as well as the defendants in the criminal case, has a thoroughly considered ruling on an important legal question, which is exclusively within the province of the court.

The petition for writ of mandamus is therefore denied.