452 F.2d 704
 UNITED STATES of America, Petitioner,
v.
Honorable Jack B. WEINSTEIN, United States District Judge
for the Eastern District of New York, Respondent.
UNITED STATES of America,
v.
Albert GRUNBERGER, Defendant.
 No. 289, Docket 71-1942.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 14, 1971.
Decided Nov. 16, 1971.
 
 Edward R. Korman, Asst. U. S. Atty., (Robert A. Morse, U. S. Atty., Eastern District of New York, of Counsel), for petitioner.
 Nathan Lewin, Washington, D. C. (Miller, Cassidy, Larroca & Lewin, Washington, D. C., of Counsel), for defendant Grunberger.
 Before FRIENDLY, Chief Judge, CLARK, Associate Justice, Retired,* and KAUFMAN, Circuit Judge.
 FRIENDLY, Chief Judge:
 
 
 1
 A conscientious and ingenious district judge has here endeavored to provide opportunity for an appellate ruling on the nature of a trial judge's powers and responsibilities when a jury has found a defendant guilty on evidence which was facially sufficient but which the judge, for well articulated reasons, could not credit. This praiseworthy effort has presented us with problems of no little complexity.
 
 I.
 
 2
 Albert Grunberger was convicted in February, 1969, after a jury trial before Judge Mishler in the District Court for the Eastern District of New York on three counts of having concealed, sold and facilitated the transportation of Swiss watches smuggled into the United States in violation of 18 U.S.C. Sec. 545 and one count of conspiring to do so.[1] On his appeal this court rejected a contention of insufficiency of the evidence for submission of the case to the jury, but reversed the conviction because of trial errors, and directed a new trial. United States v. Grunberger, 431 F.2d 1062 (1970). The opinion noted that, after the case had been argued on appeal, Grunberger had moved in the district court for a new trial on the ground that he had newly discovered evidence proving that the 2,000 watch movements which the Government had claimed he had sold to Kalman Berger, the chief government witness, already belonged to Berger. In light of the disposition of the appeal we found a remand for consideration of this motion to be unnecessary since "the way is now open for appellant to introduce his newly discovered evidence" at the retrial, 431 F.2d at 1067, n. 8.
 
 
 3
 The Government's presentation at the second trial, before Judge Weinstein and a jury, differed from that in the first in a number of respects. At the first trial the Government's theory had been one of a simple "buy" transaction arranged by Berger at its request after he was assured of leniency in the smuggling prosecution then pending against him. Berger testified that he met with Grunberger for the first time on June 28, 1967, in a restaurant, and that a meeting was set for July 2 at Berger's home, at which time Grunberger would show him samples. When they met, Berger was shown the samples, the two men agreed on a price, and Grunberger described the watches as "smuggled." Their next meeting took place on July 17 when Grunberger drove Berger to a parking lot in Brooklyn, instructed him to leave a rented car there on July 19 and then go to a restaurant nearby to meet Grunberger. Berger testified that on July 19 he left the car at the lot, met Grunberger at the restaurant, gave Grunberger the keys to the car and the parking lot ticket, waited while Grunberger went off to arrange the transfer, and upon his return wrote Grunberger a check for $12,000 for the watches. Berger then testified that he and the Customs agents examined about a half dozen of the 2000 watch movements contained in a shopping bag in the trunk of Berger's car and bearing the trade name COVA, and found these movements to be unsymboled. Berger also stated that, based upon his experience as a watch smuggler, the movements were wrapped in the way smuggled watches normally are, as opposed to the way legally imported movements would be packed. Customs agents testified that a record check of all domestic ports of entry failed to show that COVA watch movements had been legally imported. From this the jury could properly infer that these movements were illegally imported. Grunberger asserted that the movements belonged to Berger all along, although he conceded that he had been a party to the delivery to Berger of 2000 watch movements from one Herstig, a watchmaker whom Berger had hired to remove the mark *LEICA* and substitute the name COVA. See 431 F.2d at 1065.[2]
 
 
 4
 Prior to the second trial, examination of the watch movements demonstrated that *LEICA* had originally been inscribed on their face and that COVA had been superimposed. * LEICA* was Berger's trade name at least until just prior to the transaction here at issue. Berger was apparently informed of this either by a Customs agent or by the Assistant United States Attorney who handled the first trial. It was also shown that a large quantity of the *LEICA* faces had been manufactured in Germany in 1965-upon whose order is unclear.
 
 
 5
 In light of the newly discovered evidence, the prosecution dismissed two counts of the indictment charging sale and conspiracy. The prosecutor's summation made plain the Government's position that even if the jury found no sale on July 19, they could find that Grunberger knowingly concealed and facilitated the transportation of illegally imported watches with knowledge that they were illegally imported.
 
 
 6
 The Government endeavored to avoid putting Berger back on the witness stand at the second trial. It called him only after the judge indicated that without his testimony the Government had failed to make a prima facie case that the movements were illegally imported and that Grunberger knew this.
 
 
 7
 The prosecutor examined Berger only briefly and most of the story came out on cross-examination. One variation was that whereas at the earlier trial Berger testified that his first meeting with Grunberger occurred on June 28, he now said that Grunberger unexpectedly showed up at his house on July 2, and, as he was on his way out, got into his car, showed him a number of samples, and asked whether Berger would be interested in purchasing a larger quantity. More important variations in Berger's story related to the watch movements themselves. Whereas at the first trial Berger testified that he simply agreed to make a swift purchase of a large quantity of movements, at the second trial, faced with the knowledge that in fact the recovered movements bore his long standing trade name *LEICA*, he now asserted that he had ordered these from Grunberger some two and one-half years earlier, and these were the watches being delivered. As to the *LEICA* inscription, Berger now said that the samples Grunberger showed him at his home had this inscription, and that the watches recovered on July 19 also were so inscribed. In fact, however, all the watches recovered on July 19 showed the inscription COVA. Apparently Berger was not aware that the *LEICA* inscription had been found only after careful scientific examination disclosed that it underlay COVA, and Berger could thus not have seen it when the movements were delivered. Berger stuck to his story that Grunberger had described the watches as smuggled. Customs agents testified somewhat inconclusively that although the earlier record check regarding COVA watches had failed to disclose their legal importation-a fact now insufficient to support an inference of illegal importation since the movements were found to have originally had *LEICA* inscribed on their faces-a partial record check of domestic ports of entry also failed to show the *LEICA* movements were legally imported.
 
 
 8
 Grunberger moved for acquittal under F.R.Cr.P. 29 both at the close of the Government's case and at the end of the entire case. Judge Weinstein denied both motions.[3] The jury, on March 29, 1971, found Grunberger guilty on the two counts for wilfully and fraudulently concealing and facilitating the transportation of 2,000 unsymboled Swiss watch movements, knowing the same to have been illegally imported into the United States.
 
 
 9
 After unsuccessfully renewing the motion for acquittal upon the bringing in of the verdict, Grunberger filed written motions for acquittal and, if that were denied, for a new trial, within the time permitted by F.R.Cr.P. 29(c) and 33. Argument was first heard on May 14, 1971. The judge then indicated an intention to adhere to his previous rulings with respect to the motion for acquittal; the hearing was adjourned so that the Government might file a brief.
 
 
 10
 On June 10 Grunberger came on for sentence. The judge began by saying:
 
 
 11
 Continuing to reserve decision on the main motions, I sentence the defendant to one year imprisonment but suspend execution of sentence and place him on probation for a threeyear period. In addition I sentence him to a fine of ten thousand dollars. The execution of the fine may be stayed for thirty days from that payment.
 
 
 12
 Pursuant to this the judge at some time signed a judgment of conviction, which was duly entered by the clerk. He then continued:
 
 
 13
 Now, I will address myself to the question of the motions.
 
 
 14
 Pursuant to the authority that I have under Rule 33, I would grant a new trial to this defendant as required in the interest of justice based upon my hearing of Mr. Berger and a comparison of what he said in this trial and what he said in the other trial, and I believe that his statements were incredible, and that he is not worthy of belief. This, however, was a matter for the jury, and if that were the only reason for granting a new trial, I probably would allow the verdict to stand, but I think that his testimony plus the physical evidence in the case as determined from inspection of the records and dials and the like and the German manufacture of the dials, and the changes in the story of Mr. Berger and the inconsistencies within the story, as well as I think the strong feeling I get from the record that the government agency involved, and I do not criticize the agency for believing that this defendant is a well-known smuggler, but that agency had to a greater degree than is normally acceptable, suggested to Mr. Berger its desire to see that this defendant was convicted and take into account the suggestibility of Mr. Berger and his incapacity to distinguish between fact and falsity when his own interests are at stake, and, I think, the danger of a miscarriage of justice was too great in this case.
 
 
 15
 With all those circumstances plus others I won't advert to, it seems to me to come within the specific terms of Rule 33, that it requires a grant of a new trial in the interests of justice.
 
 
 16
 In this case, however, it seems to me, a new trial would not serve any useful purpose because I believe that the government has presented this evidence it now has as forcibly as it could be presented to this jury. I do not believe that a retrial would serve any purpose at all except to exhaust the government to require the expenditure of substantially more public revenue, and it certainly wouldn't serve the defendant's purposes, because I don't see how the defendant can make a stronger defense at the second trial.
 
 
 17
 Accordingly, I am going to dismiss the indictment.
 
 
 18
 Now, I have serious doubts about my power to do so, which is why I sentenced this defendant in the first place.
 
 
 19
 The judge thereupon signed an order, also dated June 10, 1971, dismissing the indictment.
 
 
 20
 After waiting until October 5, a delay occasioned, as it tells us, by the need for obtaining the approval of the Solicitor General,[4] the Government filed a petition with this court for issuance of a writ of mandamus to direct Judge Weinstein to vacate his order dismissing the indictment on the ground that he lacked jurisdiction to do so. In accordance with F.R.A.P. 21(b), we directed that an answer be filed and that the petition be set for early argument. In a letter to the clerk, the judge declined the opportunity to answer but gave further aid in defining the issue by saying:
 
 
 21
 As indicated in the records of this Court, the action challenged in the petition was designed to permit the United States Government to seek review of this Court's decision in United States v. Grunberger, 67-CR-303. That decision raised the issue of whether there are instances where, considering the totality of the circumstances, based upon articulated reasons, and in the interest of justice, a criminal proceeding should be terminated in favor of the accused even though no specific error warrants a new trial or dismissal of the indictment.
 
 
 22
 Grunberger's counsel moved to dismiss the petition for want of jurisdiction; the document filed by him also dealt with the merits. After the argument, with our permission, both the Government and defense counsel filed further briefs.
 
 II.
 
 23
 If one could decide the point simply as a matter of good sense, it would seem almost too clear to require discussion that when a litigant claims that a lower court has taken action beyond its jurisdiction, as opposed to simply erroneous action within its jurisdiction, see Will v. United States, 389 U.S. 90, 97 n. 5, 98 n. 6, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967), the court that would normally review decisions in the field in question should have power to require the lower court to set matters right. Except insofar as the double jeopardy clause might require otherwise, this would be equally true when the action was taken in a criminal case, as would be quite clear if a judge, months after entering a judgment of conviction, should, sua sponte, direct an acquittal or order an indictment to be dismissed. Compare United States v. Smith, 331 U.S. 469, 67 S.Ct. 1330, 91 L.Ed. 1610 (1947). The Government asserts that, under the authorities, notably this court's decision in United States v. Dooling, 406 F.2d 192 (2 Cir.), cert. denied sub nom. Persico v. United States, 395 U.S. 911, 89 S.Ct. 1744, 23 L.Ed.2d 224 (1969), our power to do this under 28 U.S.C. Sec. 1651 is just that plain. While the Dooling case is indeed persuasive authority for the Government, we believe the importance of the issue deserves full examination.
 
 
 24
 In order to clear the decks, we begin by saying that, despite the earnest contention of Grunberger's counsel that United States v. Sisson, 399 U.S. 267, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970), destroys the underpinnings of Dooling, we regard the Sisson decision as largely irrelevant to the issue here under discussion. The holding of Sisson was that when a district judge had released a defendant, found guilty by a jury under an indictment valid upon its face, because of the judge's belief that, on the evidence adduced at trial, application of the Selective Service Act to the defendant would violate the First and Fifth Amendments, this was not "a decision arresting a judgment of conviction for insufficiency of the indictment or information, where such decision is based upon the invalidity or construction of the statute upon which the indictment or information is founded," within the relevant provision of the Criminal Appeals Act, 18 U.S.C. Sec. 3731 (1964), subsequently amended, 18 U.S.C. Sec. 3731 (1971), even though the judge had characterized it as one. The Court was convinced that, despite its contrary form, "the decision was in fact an acquittal rendered by the trial court after the jury's verdict of guilty." 399 U.S. 288, 90 S.Ct. 2129.[5] The Government did not and, under the clear language of F.R.Cr.P. 29, could not successfully have claimed that a post-verdict but pre-judgment direction of acquittal, such as Judge Wyzanski's in Sisson, was beyond his jurisdiction. Moreover, even if it had been founded on an erroneous view of his power, the double jeopardy clause would protect the defendant against a retrial. Fong Foo v. United States, 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962).
 
 
 25
 The problem with respect to our power to issue mandamus arises from the wording of the "all writs" statute, 28 U.S.C. Sec. 1651(a). This provides:
 
 
 26
 The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.
 
 
 27
 The argument is that since, in light of the order dismissing the indictment, the defendant had taken no appeal from the judgment of conviction[6] and the order is not appealable by the Government under the pre-1971 version of 18 U.S.C. Sec. 3731, which is here controlling,[7] the issuance of mandamus cannot be in aid of our appellate jurisdiction.
 
 
 28
 The starting point for discussion is Chief Judge Magruder's scholarly opinion in In re Josephson, 218 F.2d 174, 177-180 (1 Cir. 1954). He there traced the history leading up to the present form of the all-writs statute: The Judiciary Act of 1789 expressly endowed the Supreme Court with power "to issue writs of prohibition to the district courts, when proceeding as courts of admiralty and maritime jurisdiction, and writs of mandamus, in cases warranted by the principles and usages of law, to any courts appointed, or persons holding office, under the authority of the United States," Sec. 13, and further provided that "all the before-mentioned courts of the United States, shall have power to issue writs of scire facias, habeas corpus, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law," Sec. 14. 1 Stat. 80-82. The Supreme Court's prohibition and mandamus powers (with a modification of the latter to conform to Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) which is not here material) were continued by Rev.Stat. Sec. 688 (1878), whereas the all writs section, still containing the limitation "which may be necessary for the exercise of their respective jurisdictions," found its way into Rev.Stat. Sec. 716 (1878). The dichotomy was continued in Secs. 234 (Supreme Court) and 262 (all courts) of the Judicial Code of 1911. 36 Stat. 1156, 1162. The two provisions were melded for the first time in 1948. With characteristic inscrutability, the Reviser, in a note to what is now 28 U.S.C. Sec. 1651, stated that the special provisions of Sec. 234 with respect to the Supreme Court's powers of prohibition and mandamus "were omitted as unnecessary in view of the revised section," and Sec. 234 was expressly repealed, 62 Stat. 996.
 
 
 29
 The conclusions Chief Judge Magruder drew from this history were "that decisions of the Supreme Court of the United States, at least prior to 1948, supporting the issuance, by that Court, of a writ of mandamus directed to a lower federal court, may not safely be relied upon by an intermediate court of appeals as authority for the issuance by the latter court of a writ of mandamus directed to a district court within the circuit" since "the Supreme Court might have been exercising a different sort of power from the strictly auxiliary power" given to the courts of appeals, 218 F.2d at 179,[8] and, inferentially, that the 1948 Congress meant to withdraw any such broader power from the Supreme Court.
 
 
 30
 While this is a possible reading of what the 1948 Congress did, we find it hard to believe, in the absence of better evidence than the Reviser's Note, that Congress meant to curtail a power the Supreme Court had possessed for 159 years. A decision of the Court not yet rendered at the time of the Josephson opinion has emphasized that "no changes of law or policy are to be presumed from changes of language in the [1948] revision unless an intent to make such changes is clearly expressed." Fourco Glass Co. v. Transmirra Products Corp., 353 U.S. 222, 227, 77 S.Ct. 787, 790, 1 L.Ed.2d 786 (1957). See also Madruga v. Superior Court of California, 346 U.S. 556, 560 n. 12, 74 S.Ct. 298, 98 L.Ed. 290 (1954). To be sure, this is not altogether dispositive here, for the 1948 revision must be read either as imposing a new limit on the mandamus power of the Supreme Court or as determining that both it and the courts of appeals have mandamus power over lower courts of the same breadth which the first Congress expressly conferred on the Supreme Court by Sec. 13 of the First Judiciary Act-in other words, that the phrase "in aid of their respective jurisdictions" should not be read so as to prohibit them from vacating orders, in actions generally subject to their supervision, that were beyond the power of the lower court to make, even though in the particular case there was no frustration of an appeal. Although the Court has not spoken directly to the point, we construe its post-1948 decisions as indicating its belief that, of the two readings, neither of which is wholly satisfactory, the latter more probably represents what Congress intended[9]-or, at least, would have preferred if the issue had been brought sharply to its attention.
 
 
 31
 The first such indication is La Buy v. Howes Leather Co., 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957). The Court there stated its belief "that supervisory control of the District Courts by the Courts of Appeals is necessary to proper judicial administration in the federal system. The All Writs Act confers on the Courts of Appeals the discretionary power to issue writs of mandamus in the exceptional circumstances existing here," 352 U.S. at 259-260, 77 S.Ct. at 315. While this must be read in connection with an earlier statement, "Since the Court of Appeals could at some stage of the [private] antitrust proceedings entertain appeals in these cases, it has power in proper circumstances, as here, to issue writs of mandamus reaching them," 352 U.S. at 255, 77 S.Ct. at 313 we also find significance in the majority's ignoring the dissent's strong advocacy of the views expressed by Chief Judge Magruder in In re Josephson, supra.
 
 
 32
 We find another such indication in Fong Foo v. United States, supra. In that case the district judge had directed an acquittal in a criminal prosecution before the Government had completed its case. The First Circuit issued mandamus requiring him to vacate the order. In justification of its power to do this, it cited Ex parte United States, supra, 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283, see note 8, supra, and distinguished In re Josephson, supra, on that basis, In re United States, 286 F.2d 556, 563-564 (1961). The Supreme Court based its reversal solely on the ground that the double jeopardy clause prohibited a retrial;[10] none of the Justices questioned the validity of the view expressed by the Court of Appeals with respect to its powers under the "allwrits" statute, although disagreement on that score would have afforded an easy ground for reversal.
 
 
 33
 The final datum is Will v. United States, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967), where the Court reversed an order of a court of appeals granting mandamus to require a district judge to strike a portion of his order directing the Government to file a bill of particulars in a criminal case. Although the Court said in a footnote, 389 U.S. at 95 n. 4, 88 S.Ct. at 273, "It is likewise unnecessary for us to reach the question whether the writ in the circumstances of this case may be said to issue in aid of the Court of Appeals' appellate jurisdiction," other statements in the opinion indicate a rather broad view of the power of the courts of appeals to issue mandamus, although advocating a sparing use of it, especially in criminal cases. Thus, after stating that "[m]andamus, of course, may never be employed as a substitute for appeal in derogation of these clear policies" [against appeal by the Government in criminal cases], the Court added that "[t]his is not to say that mandamus may never be used to review procedural orders in criminal cases. It has been invoked successfully where the action of the trial court totally deprived the Government of its right to initiate a prosecution, Ex parte United States, 287 U.S. 241 [53 S.Ct. 129, 77 L.Ed. 283] (1932), and where the court overreached its judicial power to deny the Government the rightful fruits of a valid conviction, Ex parte United States, 242 U.S. 27 [37 S.Ct. 72, 61 L.Ed. 129] (1916)." 389 U.S. at 97-98, 88 S.Ct. at 274-275.[11] Also, while the Court vacated the writ, it remanded the case to the court of appeals to enable that court to "give a reasoned exposition of the basis for its action," 389 U.S. at 107, 88 S.Ct. at 280. This disposition would not have been appropriate if the Supreme Court was convinced there was a jurisdictional bar to issuance of the writ except in cases where an existing or potential appeal would be frustrated.
 
 
 34
 This examination does not end our inquiry, however, since we are well aware that mandamus may not be employed to circumvent the limitations of the Criminal Appeals Act. See Will v. United States, supra, 389 U.S. at 96-97, 88 S.Ct. 269, 19 L.Ed.2d 305. Although, as we determine below, the order we review here is not in substance a judgment of acquittal as was the order reviewed in Sisson, it may well be that Judge Weinstein's order is not appealable under the pre-1971 Criminal Appeals Act. See note 7, supra. But, as we also determine below, Judge Weinstein, unlike Judge Wyzanski in Sisson, acted beyond his jurisdiction. Under these circumstances, the interests of the administration of the system of criminal justice, as well as the limitations of the Criminal Appeals Act which are founded in the policies behind the double-jeopardy prohibition, are at stake. Chief Judge Lumbard observed in Dooling, supra, 406 F.2d at 198:
 
 
 35
 We think it equally true that the fact that the government may have no right of appeal does not act as a conclusive bar to the issuance of mandamus in its favor. Certainly the restrictions placed upon the government's right to appeal do reflect important policy judgments by Congress, at their core protecting the right against double jeopardy, which must not be undermined by casual resort to mandamus. But circumstances can arise which present a compelling need for issuance of mandamus in order to further important countervailing interests. Here we find this need in our responsibility for preventing gross disruption in the administration of criminal justice, and we act pursuant to our supervisory power over the district courts.
 
 
 36
 The issuance of the writ in this proceeding will not subject Grunberger to retrial in violation of his right to be protected against double jeopardy.
 
 
 37
 We therefore conclude on the basis of the foregoing review, as well as on the authority of United States v. Dooling, supra, that we have discretionary jurisdiction to issue the writ if the order dismissing the indictment was beyond the judge's power and inconsistent with "accepted principles and usages of law."
 
 III.
 
 38
 Defendant's principal argument on the merits is that although the judge characterized his order as one dismissing the indictment, in truth and fact it was a judgment of acquittal. We have the gravest doubt whether the judge's undoubted power to set aside a verdict and enter a judgment of acquittal, F.R.Cr.P. 29(c), can survive the entry of a judgment of conviction; the two actions seem antithetical. Beyond that, however, to characterize the judge's order dismissing the indictment as one of acquittal would be to attribute to him a purpose he repeatedly and rightly disclaimed. We have already cited numerous instances of such disclaimers; there are many more. Beyond that the judge was entirely correct in acknowledging that he had no "right" to direct acquittal because of disbelief of the prosecution's witness, even though before entering judgment of conviction he had the "power" to do so.[12] F.R.Cr.P. 29(a), which abolished motions for directed verdicts and substituted motions for judgment of acquittal, directs the granting of such motions "if the evidence is insufficient to sustain a conviction * * *." Grunberger's own testimony sufficed to show that he had concealed and facilitated the transportation of the watch movements, albeit, on his view, innocently. The remaining elements of the crime were that the movements were in fact smuggled and that Grunberger knew them to be. On those elements Berger testified that Grunberger characterized the movements as "smuggled"-clearly enough to establish Grunberger's guilty knowledge if the jury believed him-and that the movements were wrapped in an illicit manner-which when combined with other circumstantial evidence such as the surreptitious conduct of the parties, Berger's past dealings in smuggled watches, and the relationship between Grunberger, Herstig, and Berger, was more than sufficient to show illegal importation. See United States v. Masiello, 235 F.2d 279, 289 (2 Cir.) (concurring opinion of Frank, J.), cert. denied sub nom. Stickel v. United States, 352 U.S. 882, 77 S.Ct. 100, 1 L.Ed.2d 79 (1956). To be sure, there were unusually strong grounds for not believing Berger. But that decision was the jury's function, not the judge's, as he reiterated time and again. The maxim "Falsus in uno, falsus in omnibus" has been well said to be itself "absolutely false as a maxim of life." 3A Wigmore, Evidence Sec. 1008 at 982 (Chadbourn rev. 1970). The correct principle was stated by Judge Campbell more than a century ago:
 
 
 39
 There has never been any positive rule of law which excluded evidence from consideration entirely, on account of the wilful falsehood of a witness as to some portions of his testimony. Such disregard of his oath is enough to justify the belief that the witness is capable of any amount of falsification, and to make it no more than prudent to regard all that he says with strong suspicion, and to place no reliance on his mere statements. But when testimony is once before the jury, the weight and credibility of every portion of it is for them, and not for the Court to determine.
 
 
 40
 Knowles v. People, 15 Mich. 408, 412 (1867). And the Supreme Court has stated that: "The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." Hoffa v. United States, 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966).[13]
 
 
 41
 In light of this, defendant's reliance on the Sisson holding that an appellate court will look at what a district court did rather than at what it said it was doing, 399 U.S. at 270, 90 S.Ct. 2117, 26 L.Ed.2d 608, is misplaced. What the judge did in Sisson was entirely plain. He refused to enter judgment on a verdict because, in his view, the Constitution prohibited him from doing so. This was, in truth and fact, a judgment of acquittal; the judge believed that, with the evidence taken in the light most favorable to the Government, it still would not support a conviction. The Supreme Court held that such a judgment of acquittal could not be transformed into the rather technical concept of an arrest of judgment, to wit, "the act of a trial judge refusing to enter judgment on the verdict because of an error appearing on the face of the record," 399 U.S. at 280, 90 S.Ct. at 2125, simply by his calling it such. It would be a far cry from this to hold that the order here in question was a judgment of acquittal, which the judge repeatedly said he did not intend to enter, could not rightly have entered and, in all probability, had lost the power to enter.
 
 IV.
 
 42
 We thus reach the question Judge Weinstein wished us to consider, namely, whether a judge has power to terminate a criminal proceeding in favor of the accused even though he has felt bound by applicable rules of law to enter a judgment of conviction on a verdict of guilty.
 
 
 43
 It is plain that no Rule of Federal Criminal Procedure confers any such power. We have already discussed Rule 29 and shown its inapplicability. The other pertinent provision is Rule 33 relating to the grant of a new trial. We have no doubt that, on Grunberger's timely motion, the judge had power to grant a new trial if he thought, in the language of the Rule, that this was "required in the interest of justice" even though, in his phrase, "no specific error" warranted this.[14] But admittedly no Rule gives the judge an overriding power to terminate a criminal prosecution in which the Government's evidence has passed the test of legal sufficiency simply because he thinks that course would be most consonant with the interests of justice.
 
 
 44
 We believe the failure of the Rules to bestow such a power precludes its exercise. The Federal Rules of Criminal Procedure were designed to provide a uniform set of procedures to govern criminal cases within the federal courts consistent with the requirements of justice and sound administration. Where previously recognized powers were thought appropriate for inclusion in the rules, this was expressly done. Most relevant for our purposes, the three rules providing for termination of a prosecution once a jury has been impaneled[15] are all embodiments of such powers: Rule 29 is an expression of the common law power to acquit for insufficiency of the evidence; Rule 34, arrest of judgment, has recently been interpreted as exactly carrying forward its common law predecessor, United States v. Sisson, supra; and Rule 48(b), dismissal by the court for unnecessary delay, was said by the Advisory Committee to be "a restatement of the inherent power of the court to dismiss a case for want of prosecution," see also United States v. Research Foundation, Inc., 155 F.Supp. 650 (S.D.N.Y.1957). Moreover, the authority for the Criminal Rules, now 18 U.S.C. Sec. 3771, specifically provides that "All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect." Thus, even if some other source had given a judge authorization to terminate a prosecution on the basis here suggested, this would be terminated in an area which the Rules have occupied to such an extent as here. If the interests of justice would be served by bestowing so broad a power as that here invoked, a matter on which reasonable minds may differ, see 8 Moore, Federal Practice (Cipes) p 29.05 at 29-13, the Supreme Court's power to amend the Rules is adequate to that end.
 
 
 45
 Apart from what we regard as the preclusive effect of the silence of the Rules, we have not been pointed to any precedent for such an inherent power. In England the judge could not even direct a verdict of acquittal for legal insufficiency of the evidence; his only power, at least in cases involving felonies, was to recommend royal clemency, which was granted as a matter of course. See, e. g., 2 Hale's History of the Pleas of the Crown 294-95, 308, 412 (2d ed. 1800); 1 Chitty, Criminal Law 508, 532 (1819); 1 Stephen, History of the Criminal Law of England 312-13 (1883); Thayer, Preliminary Treatise on Evidence at the Common Law 175 (1898); 1 Radzinowicz, A History of English Criminal Law 110 (1948). According to the same authorities, a very limited power to order a new trial after a conviction was recognized, at least after the 1660's, but then only in cases involving misdemeanors. In Ex parte United States, 101 F.2d 870 (7 Cir.), aff'd by an equally divided court sub nom. United States v. Stone, 308 U.S. 519, 60 S.Ct. 177, 84 L.Ed. 441 (1939), it was held, apparently for the first time, that a federal judge who had reserved decision on a motion to direct a verdict of acquittal could enter judgment notwithstanding a verdict of guilty. This holding was based on the alternative grounds that this power was a permissible adaptation of English practice to American conditions, 101 F.2d at 877, and that "the trial court possesses inherent power to render a judgment of dismissal pursuant to the reservation of an issue of law, when deemed essential by it to the administration of justice." 101 F.2d at 878. The court made clear that when it spoke of "an issue of law," it was referring to "the judicial function of determining the legal sufficiency of the evidence" id., not a general view on the part of the judge that, even though the evidence was legally sufficient, the jury should not have credited it.[16] The Advisor's Note to the original form of Rule 29 states that Rule 29(b) was adopted to sanction the practice approved in the case just cited; the note to Rule 29(c) adoped in 1966, shows that this was intended to permit a motion for a judgment of acquittal to "be made after discharge of the jury whether or not a motion was made before submission to the jury"-not to broaden the grounds on which a verdict might be set aside. If all this was thought needed to give the judge the power to acquit for legal insufficiency, it can scarcely be that he had a much broader power all along.
 
 V.
 
 46
 Decision that, for the reasons stated in sections III and IV of this opinion, we should direct that the order dismissing the indictment be vacated as beyond the district court's jurisdiction leaves us with a further question of disposition. Because of his belief that the interests of justice required him to follow a course which we have held to lie beyond his power, the judge, as we read his decision, did not pass on the timely motion for a new trial, which he could well have wished to grant rather than permit the verdict to stand. Almost certainly Grunberger will now ask him to do that.
 
 
 47
 If we were to look only at the language of F.R.Cr.P. 33, we would perceive no obstacle to a judge's granting a timely motion for a new trial, although made only on the ground that this is "required in the interest of justice" rather than on that of newly discovered evidence, even after he had entered a judgment of conviction. And the precise holding of United States v. Smith, supra, 331 U.S. 469, 67 S.Ct. 1330, 91 L.Ed. 1610, namely, that after the judge had denied such a motion and both the judgment of conviction and the order of denial had been affirmed on appeal, he could not thereafter sua sponte direct a new trial in the interest of justice, does not dictate otherwise. However, one of the several grounds for the decision in that case was that a "Question of finality would be raised if the trial court, while formally denying the motion for a new trial on the record, reserves the right to change its mind after the opinion of an appellate court has been elicited." 331 U.S. at 474, 67 S.Ct. at 1333. Hence, it can be argued with some force that the judge's power to grant a timely motion for a new trial in the interest of justice lapses when an appeal has been taken or the time for doing this has expired. Cf. United States v. Froehlich, 166 F.2d 84 (2 Cir. 1948).
 
 
 48
 We do not think this presents a difficulty if, as we read the record, the judge did not actually deny the motion for a new trial but rather left it undetermined because of his desire to give Grunberger something better. No appeal from the judgment of conviction has been taken, and none needed to be since a timely motion for a new trial extends the time for an appeal until ten days after an order of denial, F.R.A.P. 4(b). Our vacating the order dismissing the indictment thus leaves Judge Weinstein free to act upon Grunberger's motion for a new trial.
 
 
 49
 Petition granted.
 
 
 
 *
 Of the Supreme Court of the United States, sitting by designation
 
 
 [1]
 The court dismissed a fifth count and the jury acquitted on a sixth
 
 
 [2]
 Herstig has fled the country; he now resides in Switzerland
 
 
 [3]
 In denying the first motion, after the inconsistency between Berger's stories at the two trials had been thoroughly exploited by defense counsel, the judge said: "I am not going to grant the motion on the ground that this man is inherently incredible. . . . I think a reasonable juror can conclude beyond a reasonable doubt that this man is telling the truth on his [very likely 'in its'] essential elements. . . . I myself would not believe him and would not convict anybody, but I can't say that a reasonable juror might not and I am going to allow it to go to the jury, if that is all there is." In refusing to grant the motion for acquittal at the end of the case, the judge said: "I must say, I am not convinced by either Berger's testimony or the defendant's testimony. I suspect very strongly that the-that we still haven't gotten the truth from either of these people, but we will have to leave that to the jury."
 
 
 [4]
 Grunberger's exceedingly able counsel who, as a former member of the Solicitor General's office, was familiar with the office's procedures and was aware of the plan of the United States Attorney to seek mandamus, endeavored, properly but unsuccessfully, to persuade the Solicitor General not to grant approval
 
 
 [5]
 This passage occurs in Part IIC of Mr. Justice Harlan's opinion which alone commanded a majority. However, we do not find elsewhere in his opinion, or, for that matter, in the dissents, anything that assists Grunberger on the question of the power of a court of appeals to issue mandamus to vacate an order wrongly entered by a district court
 
 
 [6]
 The United States appealed on July 9, 1971, from the order dismissing the indictment; on July 26 the defendant cross-appealed from the same order to the extent that it "failed to enter a judgment of acquittal at the conclusion of the government's case and at the close of all the evidence." These appeals, however, are not of the same type as in United States v. Mayer, 235 U.S. 55, 35 S.Ct. 16, 59 L.Ed. 129 (1914), where the Court found that defendant's appeal from a judgment of conviction both cut off the district court's power to vacate the conviction and order a new trial, and provided a basis for the circuit court to issue an extraordinary writ in aid of its appellate jurisdiction. The Court reasoned that the district court would frustrate the then pending appeal if it vacated the judgment of conviction. Here, the appeal and limited cross-appeal are from the district court's final order, and no prior appeal will be frustrated
 
 
 [7]
 The Supreme Court has construed the pre-1971 Criminal Appeals Act-apparently with respect to the courts of appeals as well as to itself-"as confining the Government's right to appeal-except for motions in arrest of judgment-to situations in which a jury has not been impaneled, even though there are cases in which a defendant might constitutionally be retried if appeals were allowed after jeopardy has attached." United States v. Sisson, 399 U.S. 267, 302-303, 90 S.Ct. 2117, 2137, 26 L.Ed.2d 608 (1970)
 
 
 [8]
 This statement did not take full account of the fact that in Ex parte United States, 287 U.S. 241, 245-249, 53 S.Ct. 129, 130, 77 L.Ed. 283 (1932), upholding its power to issue mandamus to a district court to issue a bench warrant for the arrest of an indicted defendant, the Supreme Court expressly relied on its power under Sec. 262 of the 1911 Code to issue all writs "which may be necessary for the exercise of their respective jurisdictions," rather than the power conferred by Sec. 234. Since a defendant who had avoided arrest and trial would never have appealed and the Government could not, the case seems to constitute authority for a broad reading of the quoted phrase, and the Reviser may have had this in mind
 
 
 [9]
 This is also supported by Ex parte United States, supra, 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283, discussed in the preceding footnote
 
 
 [10]
 There is no similar problem here. Vacating the order dismissing the indictment would simply leave the judgment of conviction unimpaired, subject to whatever remedies Grunberger may have with respect to it
 
 
 [11]
 Citation of the 1932 case would indicate that the Court was not persuaded by the distinction drawn by Chief Judge Magruder in Josephson
 
 
 [12]
 While the antinomy does not precisely fit the famous Hohfeldian formulation, the distinction is nonetheless clear. The district judge in Fong Foo had the "power" to give the defendants immunity for all time by directing an acquittal because our legal system had placed him in charge of the trial, but none of the reviewing judges thought that under the facts of that case he had the "right" to do so in the sense of acting in accordance with applicable rules of law. See also Will v. United States, 389 U.S. 90, 98 n. 6, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967)
 
 
 [13]
 When proof with respect to an essential element of the crime is circumstantial, the judge may have a larger role with respect to sufficiency, since he must determine whether the web of inferences the prosecution seeks to have the jury draw has been spun too far
 
 
 [14]
 We do not join in the judge's forecast that the granting of a new trial would doom the defendant and the Government to an infinite regression. Apart from the possibilities that either the Government or Grunberger might come up with wholly new evidence, a third trial seems likely to differ from the second in at least two respects. On the one hand, it is more than likely that at a third trial the Customs Bureau will have completed its record check with respect to legal importation of movements bearing the name *LEICA*. Assuming that the results of this check reasonably support an inference of illegal importation, Berger's testimony would be unnecessary on this element of the case. On the other side, Grunberger's counsel would not be handicapped at a third trial, as he apparently was at the second, by the Government's delay in delivering certain Sec. 3500 material. If Grunberger is acquitted, that will end the matter. On the other hand, if a third jury were to find him guilty, we should suppose any judge would hesitate a long time before concluding that the interests of justice required still another trial. The two juries that have returned guilty verdicts could well have been influenced by disbelief in Grunberger's own story, see 431 F.2d at 1065, which has aspects of improbability. Cf. Dyer v. MacDougall, 201 F.2d 265, 268-269 (2 Cir. 1952) (L. Hand, J.). Indeed, as our earlier quotation indicates, see note 3, supra, the judge himself doubted that anyone at this trial was telling the whole truth
 
 
 [15]
 Rule 12, dealing with pre-trial motions, was the subject of great debate in United States v. Mersky, 361 U.S. 431, 80 S.Ct. 459, 4 L.Ed.2d 423 (1960). There, Mr. Justice Brennan in his concurring opinion, 361 U.S. at 441, 80 S.Ct. 459, 4 L.Ed.2d 423, and Mr. Justice Stewart in his dissent, 361 U.S. at 453, 80 S.Ct. 459, 4 L.Ed.2d 423, joined issue on the effect of Rule 12 on the historic "motion in bar." Mr. Justice Brennan argued that Rule 12 swept away the common law motion in bar in favor of a broader rule. Mr. Justice Stewart argued that Rule 12 merely carried forward the existing federal law relating to a motion in bar which itself was somewhat broader than its common law predecessor. But both Justices focused on what they found to be the proper interpretation of the Rule, and neither recognized any inherent power to go beyond whatever the proper interpretation was found to be
 
 
 [16]
 Indeed, the court characterized the principle, "Ad quaestionem facti non respondent judices, ad quaestionem juris non respondent juratores," as having been "enshrined in our American Constitution."