**UNITED STATES of America**

v.

**William C. SHERR, Defendant.**

**No. S 80 Crim. 0449 (KTD).**

United States District Court, S. D. New York.

Jan. 5, 1982.

John S. Martin, Jr., U. S. Atty., for the S. D. N. Y., New York City, for the U. S.;

James A. Moss, Asst. U. S. Atty., New York City, of counsel.

Stillman, Friedman & Shaw, P. C., New York City, for defendant; Edward M. Shaw, Charles A. Stillman, Julian W. Friedman, Denise G. Shekerjian, New York City, of counsel.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

■ After a fourteen day trial without a jury, defendant William C. Sherr was found guilty on one count of perjury and not guilty on six counts of aiding and abetting perjury. The defendant now moves for reconsideration of my verdict of guilty on the grounds that the evidence was insufficient to convict as a matter of law.[1] In the alternative, defendant requests that his case be reopened pursuant to Rules 33 and 12.2(b) of the Federal Rules of Criminal Procedure in order to permit the presentation of newly discovered evidence of a mental condition which purportedly negates the specific intent required to commit the crime of perjury. Defendant's counsel has presented forceful arguments in favor of reconsideration of my verdict of guilty. Nevertheless, upon a review of the record and my own very distinct memory of the trial, I must stand by my earlier determination. In addition, I do not believe the newly discovered evidence proffered by the defendant warrants a new trial. Hence, for these reasons and those that follow, defendant's motion is in all respects denied.

---

1. The government argues that this court lacks jurisdictional power to entertain defendant's motion for reconsideration of the evidence in this case. The government relies upon Fed.R. Crim.P. 29(c) which requires that motions for judgment of acquittal must be made "within seven days after the jury is discharged or within such further time as the court may fix during the seven-day period." Sherr's motion was not made within this seven-day period.

I do not believe Rule 29(c)'s seven-day limit applies to the circumstances of this case. First, this was a non-jury case to which Rule 29 has no direct application. Typically, there is no need for such a motion because a plea of not guilty has the same effect as a motion for judgment of acquittal. *See* 8A Moore's, Feder-

al Practice ¶ 29.02, pp. 29–5, 29–6, n.6 (1981). (And cases cited therein). Also, Rule 29(c) explicitly refers to jury trials only. Second, no judgment of conviction has yet been entered in this case; thus, there is nothing incongruous about this court reviewing the evidence in this case at this time. *Compare United States v. Weinstein*, 452 F.2d 704, 713 (2d Cir. 1971) ("We have the gravest doubt whether the judge's undoubted power to set aside a verdict and enter a judgment of acquittal ... can survive the entry of a *judgment* of conviction; the two actions seem antithetical.") (Emphasis in original). It appears to me that the interests of justice and judicial economy dictate that I review the sufficiency of the evidence prior to the defendant contesting the verdict on appeal.

## I.

The defendant came before this court originally charged with six counts of aiding and abetting a former client, Stephen Easton, in the commission of perjury. Subsequently, a superceding indictment was brought charging the defendant himself with an additional count of perjury. The defendant Sherr was found to have committed perjury by submitting an affidavit to this court on November 19, 1980 which stated that certain documents had been stolen by Easton from the file of Sherr's law firm Bandler & Kass. The evidence at trial showed, and defendant's counsel now readily admits, that the entire file in question was, in fact, given to Easton for use during Easton's appeal from a perjury conviction. Sherr's defense to the perjury charge was that he honestly believed that Easton had wrongfully taken the documents. The evidence at trial demonstrated, however, that the information contained in the affidavit was not only false but also that Mr. Sherr knew it was false.

The facts leading to the charge of perjury against Sherr first surfaced on September 3, 1980, when he filed a motion seeking an order "suppressing all documentary or physical evidence obtained by the government, directly or indirectly, from the files of Bandler & Kass." At that time, Mr. Sherr's attorney, Paul Bergman, submitted an affidavit with the suppression motion of September 3, 1980 which identified certain of these documents as the ones which Lans, Feinberg & Cohen, Easton's appellate law firm, had turned over to the United States Attorney's office pursuant to a May 26, 1978, grand jury subpoena. The Bergman affidavit further described the stolen documents as follows:

> 11. ... the Gold memorandum [GX 33B] ..., the Easton memorandum [GX 35] ... and other documents which are now in the hands of the government, were stolen by Easton from either the Bandler & Kass file room or storage warehouse sometime between June, 1977 and April, 1978. They were taken by Easton who, thereafter, destroyed portions of the files' contents and, in other

instances, delivered portions to the government. When this theft was first discovered in May, 1978, and Easton was confronted with it, he admitted that he had taken the files but claimed that he had returned them to a warehouse jointly utilized by himself and Bandler & Kass in April, 1978, a month before ....

> 12. Among others, the documents missing included the two documents which are so prominently mentioned in paragraphs 7 and 8 of the indictment; that is, Gold's memorandum of November 5, 1976 (Exhibit D) [GX 33b] and Easton's memorandum to Sherr in late November, early December (Exhibit E) [GX 35].

> \* \* \* \* \* \*

> 14. ... As shown from item 2 of the attached inventory prepared by the Lans, Feinberg & Cohen firm (Exhibit F, annexed hereto) [GX 62], Gold's November memorandum appears to have come into the government's hands not from Easton directly, but rather, through his current attorney [Lans, Feinberg & Cohen].

Bergman also described other missing documents as including "handwritten notes which were prepared by Sherr and Gold based upon conversations with Easton" and notes on witnesses prepared by Easton for Sherr.

In November, 1980, Sherr submitted his own affidavit in support of this motion to suppress after the United States Attorney requested that someone with first-hand knowledge describe the circumstances providing the basis for the motion. On or about November 14, 1980, one of Sherr's defense attorneys drafted in Sherr's presence the affidavit which became the subject of Count 7. The affidavit reads in its entirety as follows:

> 1. I am an attorney duly admitted to practice law before this Court. I am also the defendant in this action. I submit this affidavit in connection with a motion to supress [sic] certain evidence enumerated in a motion, made on my behalf, dated September 9, 1980. Specifically, that motion to suppress deals with the

allegation that numerous documents now in the government's possession were unlawfully taken by Stephen K. Easton from the files of my law firm, Bandler & Kass.

2. I have been advised by my counsel that the government considers counsel's affidavit to be inadequate because it does not present any "firsthand information". (Aff. of James Moss, Esq., at Para. 25). In order to lay to rest that claim without embroiling the Court in unnecessary legalities, I have attached to this affidavit a copy of a memorandum (Exhibit A) which I prepared on May 26, 1978, four days after I learned that Mr. Easton had, in fact, taken the files without my authorization nor the authorization of anyone at my firm. I hereby incorporate the contents of that memorandum. In addition, I have attached hereto as Exhibit B a copy of the May 26th memorandum which contains my handwritten notations as well as the signatures of Richard Gold and William Werner. The contents of those documents speaks for themselves.

3. Neither Exhibits A nor B specifically mention the removal by Mr. Easton of certain documents, including handwritten notes by Mr. Easton as to each of the various corporations. Those documents were also missing as of May 26th and, in fact, when the government counsel recently made available a group of documents which had recently been obtained from Mr. Easton, those handwritten notes were not among them except in one instance.

The memorandum incorporated into the affidavit was written by Sherr to his defense attorneys on May 26, 1978. This memorandum purportedly sets forth the basis for Sherr's belief that certain documents were stolen. The memorandum reads as follows:

RE: LIST OF MATERIAL MISSING FROM BANDLER & KASS FILE ENTITLED *U. S. A. V. STEPHEN K. EASTON*

On May 22, 1978 I instituted a search for the above mentioned file. Much to my dismay I found that the entire file had been taken from our office by Mr. Easton some time in April or May, 1977. He admitted this to William J. Werner when questioned and advised that he had returned the file to a warehouse utilized jointly by Bandler & Kass and Stephen K. Easton approximately three weeks ago, i.e., the middle of April, 1978.

The file, when located, was reviewed by our office and following is a partial list of material that is missing therefrom that we were able to ascertain:

1. Stephen K. Easton memo to Bandler & Kass re history of involvement.

2. Stephen K. Easton memo prior to trial as to each company and financials thereof. [GX 35]

3. Stephen K. Easton summary by category as to financials prior to taking stand. [GX 47]

4. Stephen K. Easton summary of facts as bearing on testimony of other witnesses.

5. William C. Sherr trial notes and outline of questions and subject matter for direct examination of Stephen K. Easton (entire subfolder).

6. Miscellaneous William C. Sherr handwritten notes from certain of the files on many of the companies.

7. Receipt for storage of fur coat dated prior to event.

8. Notes on Bandler & Kass investigation of Buffalo flight.

9. Photostat of stock certificate.

10. Miscellaneous memos prepared by Richard L. Gold as to facts.

11. Pre-trial motion file.

*NOTE*: Immediately upon discovering that portions of said file were missing, I telephoned Miss Lans of Mr. Cohen's office, 421–0700 on May 22, 1978. She admitted to me that she had portions of our file which her firm had removed therefrom and retained, and agreed to permit me to examine same, but not before 4:00 p. m. on Wednesday, May 24, 1978. She also stated that she had a transcript of Mr. Easton's testimony.

We attempted to reach her all during the day on May 23, 1978 to see if we could pick up the file, but our calls remained unanswered. Pursuant to my conference with Mr. LaRossa on May 23, 1978, it was agreed that the May 24, 1978 appointment would be adjourned and that the followup on this matter would be handled by his office.

*NOTE*: We have also been unable to locate our file 4085(1) which is the matter of *Chemical Bank v. Stephen K. Easton and Irtep.*

Sherr added handwritten notes to this memorandum to create three new categories of missing documents. In addition, both Werner and Gold (attorneys at Bandler & Kass) signed a note, dated May 30, 1978, at the bottom of the memorandum stating that "we have reviewed items 1 through 14 together with WCS handwritten notes contained herein and some are correct to the best of our recollection and knowledge." The government evidently came into possession of the allegedly stolen documents through a subpoena issued to Lans, Feinberg & Cohen.

Count 7 was added to the indictment in February, 1981. Specifically, it charged Mr. Sherr with having made a false material declaration to the court, to wit, "that on May 22, 1978, he had learned that Stephen K. Easton took certain documents without authorization, when in truth and in fact, as he then and there well knew, those documents had been loaned to attorneys representing Stephen K. Easton with the express authorization and approval of William C. Sherr and other attorneys at Bandler & Kass." Mr. Sherr was ultimately convicted of perjury as proscribed in 18 U.S.C. § 1621.

■ The crime of perjury in essence is the making of a material false statement with the belief that the statement is false. *See United States v. Sweig*, 441 F.2d 114 (2d Cir. 1971), *cert. denied*, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971). The defendant argues on the instant motion that the proof presented at trial was insufficient to show that Mr. Sherr's affidavit makes any false statement at all, much less that he

intended to make any false statement. Further, the defendant argues that any false statement that could have been made was not material.

The defendant argues that Sherr's affidavit referring to the files which Easton had "taken ... without my authorization" was not intended to reflect that the entire file which had been loaned to Easton's appellate lawyer in the Spring of 1977 was stolen. Rather, it is urged that Sherr "quite reasonably" believed that Easton absconded with certain key documents sometime after the loan was made. Defendant points out that his November, 1980 affidavit sought to suppress only "numerous documents" then in the government's possession, not necessarily to suppress the entire file. Sherr was not concerned with the original proffer of the file to Lans, Feinberg & Cohen but with the subsequent revelation that documents were missing after the file was returned by Easton to the Bandler & Kass warehouse in the Spring of 1978. Sherr alleges he had the following additional reasons to suspect Easton was responsible for the absence of documents from the file: (i) Lans, Feinberg & Cohen did not have the missing documents; and (ii) Sherr knew that he was under investigation by the government and that Easton, having already been convicted, was cooperating with the government in the investigation.

Finally, the defendant now argues that it simply was improbable that Sherr meant to deny under oath that he originally loaned the entire file to Easton and his appellate attorneys. As is pointed out by Sherr's counsel, the "offer of the file to Easton's appellate lawyers ... was made in the presence of four witnesses and followed up by Deborah Lans' review of the file and her taking to her office much of its contents." (Defendant's Reply Memorandum, p. 13). Also, Sherr made repeated efforts on May 22 and 23 of 1978 to reach Deborah Lans in order to inspect her file, a fact he disclosed in his May 26, 1978 memorandum to James LaRossa. It is argued that this evidences Sherr's genuine belief that documents were missing. The original proffer was simply

an irrelevant fact to Sherr once he discovered that documents were missing.

Although this interpretation of the evidence at trial is not without some appeal, I believe it contradicts the record. Sherr's claim that he was concerned with only certain "key documents" rather than the whole Easton file when he made his motion to suppress is not supported by the original notice of motion filed on September 10, 1980 which sought to suppress "all documentary or physical evidence obtained by the government, directly or indirectly, from the files of Bandler & Kass ...." Sherr's affidavit in support of the motion continues this broad description. According to Sherr, the "motion to suppress deals with the allegation that numerous documents now in the *government's possession were unlawfully taken by Stephen K. Easton from the files of my law firm, Bandler & Kass.*" (Sherr Affidavit ¶ 1). Any doubt about whether Sherr is referring to only a part of the files is laid to rest in the next paragraph of the affidavit where Sherr states that the May 26, 1978 memorandum was prepared "four days after I learned that Mr. Easton had, in fact, taken the files without my authorization nor the authorization of anyone at my firm." Moreover, the memorandum incorporated into the affidavit recounts Sherr's search for the files as follows:

> Much to my dismay, I found that the *entire* file had been taken from our office by Mr. Easton some time in April or May, 1977. He admitted this to William J. Werner when questioned and advised that he had returned the file to a warehouse utilized jointly by Bandler & Kass and Stephen K. Easton ... [in] ... the middle of April, 1978." (emphasis added).

The memorandum listed at least eleven items which were found missing when the file was finally located.

These statements by Sherr are perjurious because, in fact, according to the proof at trial, the files were never removed by Easton from the offices of Bandler & Kass without authorization. The testimony of Easton, Deborah Lans and William Werner all demonstrated that the files were given to Easton. Perhaps the principal piece of trial evidence which reveals the true status of the files and Sherr's knowledge thereof is Sherr's own recorded conversation with Easton in June, 1978:[2]

EASTON Which memorandum now? The one that ...

SHERR The memorandum you gave me. When we were preparing for the trial.

EASTON The one, the one I initially talked to Richie about?

SHERR I'm talking about the memorandum you made up on your typewriter, that you gave to your secretary.

EASTON I never got through that memorandum.

SHERR Yes you did. I got page six of it Steve.

EASTON But it didn't go into each of the detailed financial statements.

SHERR Steve, where's the first five pages?

EASTON I don't know.

SHERR Did you destroy them?

EASTON Absolutely not. Absolutely not!

SHERR Cohen gave us page six.

EASTON That's all you have?

SHERR Your lawyer gave us page six.

WERNER He gave Bill back page six of your memo. We didn't have it. We didn't have any of it.

SHERR It was taken out of my file, our file ...

WERNER (Inaudible) However it was done.

EASTON If anyone took it out it was my attorney and he should have given you back the whole thing.

SHERR He said all, we called him up, he said all he has is page six.

EASTON Yeah which doesn't make sense at all.

WERNER No ... (Inaudible).

SHERR You know why? I'm telling you why the first five pages were removed

---

2. Sherr secretly recorded these conversations with Easton once Sherr found out that Easton was a witness in the government investigation against Sherr. (Tr. 1010–11).

Steve, because in those five pages you denied certain things about certain companies, not only just Fairway. You denied having anything to do, you knew nothing about certain of those companies. In some you said you thought you might have prepared the financial statements, no question about it.

EASTON   If they put me on the witness stand, if it ever gets to that, which again I hope it doesn't, I'm I'm—gonna absolutely admit I denied preparing the fi..., the financials for Fairways Development (inaudible).

SHERR   Not only Fairways Steve. Don't just uh, limit it to Fairways. Those five pages weren't on Fairways. Those five pages were on every company. And I wonder you know, why those five pages were removed. There's other stuff missing from that file too. I don't know, maybe Cohen has it, just doesn't want to give it to me.

EASTON   He really, you know, he is not not cooperating on this thing.

SHERR   It's not a question of cooperating. All we wanted was our file back. Steve, I have nothing to hide . . . .

EASTON   Do you want me to ask uh—Cohen again?  Okay that's—that's another thing, you—you went down with me, you volunteered my cooperation . . . .

SHERR   Absolute.

EASTON   . . . with the U.S. Attorneys Office.   Correct?

SHERR   Yeah. So . . . .

EASTON   (Inaudible)

SHERR   So I'm a bad man.

EASTON   No, no, no, I really—I think that's in your favor right?  I mean because you didn't think there was anything . . . .

SHERR   Steve you asked for your file, we gave you the whole file.  Did we take anything out of the file?

EASTON   Absolutely.  What, what, you mean . . . ?

SHERR   The Easton file.

EASTON   Yeah, when I, it was sitting in my office.

SHERR   We gave you the whole file we didn't even take out our—our correspondence our notes, you had the whole file.  You took it over to your lawyer. He had it for . . . .

EASTON   I don't know what happened, his assistant came down and looked through it and took what she needed for the appeal.  I never, it never really left this office . . . .

SHERR   Okay and you kept it in your office, for what, a year?

EASTON   From the trial till when, till when I gave them back to you.

SHERR   You never gave them back to us, you sent them over to, to the warehouse in your room Steve.

EASTON   No.

SHERR   Yes.   That's where we found them Steve.

EASTON   It was not . . . .

SHERR   Steve, hey, it was not what?

EASTON   It was not supposed to be that way.

SHERR   That's where it was Steve.

EASTON   Al was told that these were your files and to send them back to the warehouse.

SHERR   (Inaudible)   They, we got them about three weeks before you spoke.  I mean uh, I'm sorry, they had been sent over to the warehouse about three weeks before you spoke to Bob, and told him uh about this investigation. It's not the point, that's where we found the file, but we didn't hold anything back when we gave you the file. And we're upset that parts of the file are missing.  And I'd like you to ask Bob Cohen for your memorandums, there were two of them.  We got page six of one.  You did two . . . .  (GX 59A) (emphasis supplied)

The contents of this tape did not come to the attention of Sherr's trial attorneys until January, 1981.  Evidently, this is the reason Mr. Bergman's affidavit which originally accompanied the motion to suppress represented that Easton had stolen the files. Sherr quite obviously had not revealed even

the fact of the loan of the file to his attorneys.

On the instant motion, the defendant reasons that the loan was of no significance to the fact that Easton later stole the file, and therefore, this loan did not need to be disclosed in order to explain the basis for the suppression of documents. I do not accept this rationalization for Sherr's conduct. Even assuming that Sherr's affidavit was addressed to an event which occurred after the loaning of the files, there can be no explanation for Sherr's failure to explain to the court at that time, either directly or indirectly through his attorney, that the loan of the file had first taken place. The original loan is an integral part of understanding the defendant's argument that Sherr was focusing on an event after Easton had been loaned the files. Obviously, there is a distinction between taking the files without authorization and failing to return borrowed files. One cannot explain the latter without first describing the terms of the loan, including when the borrower's obligation to return the file arises. To accept the defendant's instant explanation for his past actions would refute his own logic. Judging from the circumstances Mr. Sherr found himself in between the Spring of 1978 and the Fall of 1980, and considering the way he handled the trial of Stephen Easton and the subsequent government investigation, I must conclude that Sherr sought to deceive this court into believing that Easton had stolen the files from Bandler & Kass. Accordingly, the motions to reconsider the verdict is denied.

## II.

I turn now to the second part of defendant's motion, which is an alternative motion for an order reopening the case pursuant to Rules 33 and 12.2(b) of the Federal Rules of Criminal Procedure, on the grounds that there exists newly discovered evidence of a mental condition negating the mental state required to convict the defendant of perjury. To obtain a new trial based on newly discovered evidence, a defendant must show that the evidence was discovered post-trial, that it could not, with the exercise of due diligence, have been discovered earlier, and that the evidence would probably produce a different result on a new trial. *See United States v. Slutsky*, 514 F.2d 1222, 1225 (2d Cir. 1975).

The defendant argues that "Mr. Sherr was suffering by the Fall of 1980 from severe mental stress, characterized by anxiety, depression, and a variety of hypochondriacal complaints. The consequence was a mental condition in which he was overwhelmed by non-productive brooding about his situation, and in which his ability to focus attention and concentrate on present and past events was substantially impaired." (Shaw Affidavit ¶ 46). It is asserted that this condition negated the specific intent necessary to commit the crime of perjury. *E.g., United States v. Dudley*, 581 F.2d 1193, 1198 (5th Cir. 1978). After reviewing this offer of new evidence, I do not believe it would produce a different result in this case.

The basis for the request for the new trial is the affidavits of two psychiatrists and one internist. Dr. Edward Gendel, a psychiatrist, examined Mr. Sherr on various occasions beginning in August, 1980. Mr. Sherr was hospitalized approximately five weeks after the trial in this case and was treated by another psychiatrist, Dr. Berney Goodman. Also, Dr. Gerson Nonas, Mr. Sherr's physician since 1977, examined Mr. Sherr in September, 1980. Each doctor diagnosed Mr. Sherr as a severely depressed individual. According to these physicians, Mr. Sherr's mental condition has deteriorated steadily since he learned he was the focus of a government investigation in May, 1978 and more rapidly after his indictment. His deteriorating condition reached its nadir when the verdict was rendered in this case. The medical consensus is that during the Fall of 1980, Mr. Sherr was suffering great psychological pain and, at that time, was becoming increasingly withdrawn from active life.

Aside from the descriptions in these affidavits of the pain Mr. Sherr has endured, there is no opinion expressed regarding Mr.

Sherr's ability in November, 1980 to recall specific events from the Spring of 1978 or his mental capacity to lie. Dr. Goodman states "I cannot, of course, give an opinion as to whether any particular statement made by Mr. Sherr in November, 1980 was a statement which he knew to be a false statement. However, ... it is my opinion that by that time, he was suffering a continuous impairment of his ability to focus attention and concentrate on present and past events." (Goodman Affidavit ¶ 14). Dr. Goodman elaborated on this opinion in a conference with me just prior to Mr. Sherr's sentencing:

Q. Do you think he had the ability to make up his mind as a rational human being, for example, to try the case without a jury?

\*    \*    \*    \*    \*    \*

A. Let me answer that by saying what I see now, because I think that would be— if he was very similar to what he is now, and I think that he was approaching what he is now, I don't think so. Not because he couldn't understand the words of what were being said to him, because he can; there is no neurological or cognitive deficit. I mean, he understands everything you are saying to him.

But this man is so overwhelmed with anxiety and so preoccupied with what is going on in his life and the trauma done to him that there is no room for anything else.

He is not his full self.

(Tr. pp.15–16, April 16, 1981).

Dr. Gendel stated that "It is common for persons in such conditions [as Mr. Sherr's] to suffer forgetfulness and substantial impairment of the ability to focus and concentrate attention on specific subjects. I cannot, of course, give an opinion on the question whether Mr. Sherr did or did not focus on and recall any particular fact at any time during the latter part of 1980. However, it is my opinion that during August through early October, 1980, the stress from which Mr. Sherr was suffering was so pronounced as to make it very likely that there were frequent occasions on which his ability to concentrate, focus attention, and recall to mind past events was substantially impaired." (Gendel Affidavit ¶ 14).

Although these learned opinions raise the possibility that in November, 1980 Mr. Sherr did not completely recall the events of the Spring of 1978, I believe that that possibility is too remote, given the circumstances of this case, to change my verdict. Mr. Sherr's affidavit, although initially drafted by his attorney, incorporates a memorandum written by Sherr alone. This memorandum was written at a time before the indictment came down when Mr. Sherr's anxiety was not pronounced. Significantly, the memorandum by itself is false. Mr. Sherr reviewed drafts of the affidavit drawn by Mr. Bergman on more than one occasion before signing it. *See* Government's Exhibit 60. He even suggested a revision. To my mind, these facts evidence a clear understanding of exactly what he was swearing to. As a result, I do not believe the medical testimony would alter the verdict in this case. I also had the opportunity to observe the defendant during the initial aborted jury trial in this case and the subsequent non-jury trial which resulted in the verdict. While he was obviously depressed there did not seem to be any real impairment of his mental functions. The motion for a new trial is therefore denied.

In sum, defendant's motion for reconsideration of the verdict or in the alternative for a new trial is denied. Judgment of conviction on Count 7 of the indictment will enter forthwith.

SO ORDERED.